**TOWN OF NEW WINDSOR et al.,**
**Plaintiffs,**

v.

**William J. RONAN et al., Defendants.**

**No. 71 Civ. 3062.**

United States District Court,
S. D. New York.
August 12, 1971.

Winer, Neuberger & Sive, New York City, for plaintiffs; David Sive, Sigmund Anderman, New York City, of counsel.

Cravath, Swaine & Moore, New York City, for defendant, Metropolitan Transportation Authority and the defendant members thereof; John R. Hupper, Norman J. Itzkoff, Ronald S. Rolfe, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen., of the State of New York, Pro Se pursuant to New York Executive Law, § 71, and for Defendants, Theodore W. Parker, Richard Dunham and Arthur Levitt; Daniel M. Cohen, Asst. Atty. Gen., of counsel.

Whitney North Seymour, Jr., U. S. Atty. for the Southern District of New York, for defendants, John A. Volpe, and John Schaeffer; Daniel Riesel, Asst. U. S. Atty., of counsel.

## OPINION

FRANKEL, District Judge.

Plaintiffs seek the extraordinary remedy of a preliminary injunction to block a state exercise of the eminent domain

power where the particular takings have been authorized by the state legislature to meet projected needs for airport facilities. The papers are lengthy and learned on both sides. For reasons outlined below, the motion of plaintiffs and a cross-motion of certain defendants will be denied.

## I.

To set the scene very briefly, the court could notice, what everyone knows and the papers before us show, that the metropolitan centers of the world are beset by problems of noise, congestion and danger attendant upon jet air transportation and overtaxed airport facilities. Deep questions as to how many of the trips are necessary remain subjects for controversy elsewhere. For our purposes it may be accepted that the existing and dimly foreseeable problems require long-range planning, estimates of contingencies and, where possible, provision for alternative courses of action in light of future developments. Defendants' papers portray informally, but without dispute, the current travail of Los Angeles, which is reportedly in process of spending some $200,000,000 to acquire land and almost 2,000 homes around its International Airport, where expectable problems of increasing airplane noise should probably have precluded building of those dwellings in the first place.

The area involved in the present case centers around Stewart Airport near Newburgh, New York. Originally built as a municipal airport for Newburgh in about 1930, Stewart became an Air Force base in 1942 and was a military installation until 1970. On March 1, 1970, the defendant Metropolitan Transportation Authority (MTA) began to operate the Airport as lessee and licensee of the Defense Department. In July 1970, MTA acquired title to 1590 acres of the facility, leaving 542 acres still owned and used by the Federal Government.

The New York Legislature passed in April of this year, and amended in May, "An Act to authorize the establishment of an airport for the accommodation of domestic and international air travel and freight transport at Stewart airport and the making of an appropriation therefor." Signed by the Governor in June, the Act as amended grants to MTA authority

"to establish, construct, expand, rehabilitate, improve, maintain, reconstruct and operate at Stewart airport * * * an airport for the accommodation of domestic and international air freight transport, general aviation and such other airport purposes for which there may be need from time to time."

The Act gave MTA $30,000,000 for the costs of this enterprise, "including the acquisition of real property or interests therein." Shortly afterward, an additional $15,510,000 was granted as part of a supplemental budget. It is provided that if any federal money is received for the project, MTA may retain and apply it. If the need for acquired lands or interests "is not immediate," the MTA is to transfer possession to a subsidiary "specially created for the interim administration and management of such property." Provision is also made for state payments to local taxing units in lieu of taxes lost by the takings, the payments to be based upon a prescribed scheme of "transition assessments."

Among the pertinent materials supplying the context of this state law is a Federal Aviation Administration Task Force Report issued in September 1970. The Task Force, as stated in the Foreword to its Report, was "concerned about increasing air traffic delays and airport congestion * * *." Accordingly, it

"undertook to develop a complete analysis of the demands on the New York metropolitan airport system, the expected growth factors for the area as related to national forecasts, and an appraisal of the capacities of the existing airport facilities, as well as the application of any theoretical improvements to these facilities that could be considered."

It noted the consensus "that the existing New York airports cannot serve the

area efficiently \* \* \* [or] continue to cope with industrial expansion or with population growth factors." It recorded widespread views in responsible quarters that a failure to solve this problem could cause stagnation and economic hurt "to the New York metropolitan area and to the nation." Concerning the Stewart Airport, the Report said:

"Concurrent with the declaration of this airport as surplus to the needs of the Air Force by the Department of Defense, the Metropolitan Transportation Authority has been given approval and has accepted and commissioned the operation of this facility as a general aviation airport. The airport is 55 miles away from New York City and located adjacent to the New York State Thruway and Route 184. Its present acreage is 2,186 acres, with land to the west and southwest which is uninhabited and which appears to be available for the requirements of an expanded facility.

"There are no insurmountable topographic or airspace problems if expansion were to be considered. The location, from a ground access viewpoint, is good. The only limiting factor is a lack of a high speed ground transportation system. In addition to the highway accessibility noted above, the airport lies close to the Erie Lackawanna rail right of way whose spurs connect the site with Newark, New Jersey, and can provide additional improved rail links with New York City proper.

"The airport itself has two runways, one 7,000 feet long, and one 6,000 feet long, and is capable of handling medium range aircraft. The airport has a practical annual capacity of about 160,000 operations under its present configuration. It is located in an area of rapidly growing population and could significantly relieve the existing metropolitan area airports. It has the potential of being developed as a major air carrier airport, as well as a cargo and freight facility. Its location indicates that it may present one of the last viable opportunities for additional major airport facilities in the area."

While their prediction may prove ultimately to be incorrect, the Governor and Legislature of New York have determined—and allocated large sums of public money based upon the determination —that the Stewart area should be taken and developed as one of the few available sites for probable major airport expansion. Some immediate uses for the land have been perceived by these elected officials—e. g., "for runway extension, facilities and a buffer zone \* \* \*." [1] Beyond the work now in contemplation, it is intended that "other development of the airport will only be in response to need." [2] Elaborating the views underlying the state legislation, the Governor issued a memorandum at the time of his signature, mentioning both the present program and the projected use of the land for "such other purposes as may be necessary from time to time." He reviewed and underscored the needs and the problems covered in the FAA Task Force Report. He noted the effort to anticipate and minimize future problems requiring "noise buffer zones and other sound ecological protections \* \* \*." He mentioned the desirability of "moving now on the improvement, expansion and development of Stewart Airport while land in the area \* \* \* is largely undeveloped [which] will mean minimal relocation of people and businesses \* \* \*."

Following enactment of the state law, on July 6, 1971, defendant MTA, through its Chairman, defendant Ronan, issued a public statement announcing the beginning of steps to acquire approximately 9,000 acres west of Stewart Airport. The statement described the area in question. It quoted the Chairman as as-

---

1. Joint Statement of the Governor and members of the Legislature, May 18, 1971.

2. *Id.*

suring affected residents that they "will be able—if they wish—to stay for two years at the minimum." It listed available payments to landowners—of moving expenses, closing costs and other things in addition to "just compensation." It repeated the Governor's expressions predicting benefits to both the region and the State from proposed development.

Fired by contrary sentiments, the plaintiffs brought the instant suit on July 9, 1971. The plaintiffs are three towns variously containing or adjoining the proposed development, associations and corporations concerned with the land and environment of the region, and four owners of homes and properties totalling some 260 of the affected acres. Defendants, in addition to MTA and its members, are various state and federal officials and agencies. The complaint pleads seven claims for relief, not all of which are significant for purposes of the motion now before the court. It seems sufficient for now to state the gist of the claims this way:

(1) The proposed acquisition is unlawful under the Airport and Airway Development Act of 1970, 49 U.S. C. § 1701 et seq. (AADA) because the development has not been approved by defendant Secretary of Transportation Volpe.

(2) The "New Airport," as plaintiffs call it, is not properly planned "and is proposed without consideration of feasible and prudent alternatives." [3]

(3) The MTA is proposing to act *ultra vires* and otherwise in contravention of state law.

For purposes of the pending motion, the essence of the complaint, still more briefly stated, is that the proposed takings are not for a valid public purpose and should, therefore, be enjoined under both federal and state law. To buttress the claim of need for preliminary relief, plaintiffs stress that the MTA is empowered under state law to vest title in the State before any determination of validity can be had. While this is the subject of some possible question, it is accepted as correct for our purposes.

## II.

■ A specific determination of "public purpose" to justify a specific taking, embodied in a specific state enactment, is "well-nigh conclusive," Berman v. Parker, 348 U.S. 26, 32, 75 S.Ct. 98, 99 L.Ed. 27 (1954), that there is indeed a justification in the public interest for exercise of the eminent domain power. See also United States ex rel. TVA v. Welch, 327 U.S. 546, 552, 66 S.Ct. 715, (1946); Rindge Co. v. Los Angeles County, 262 U.S. 700, 705–706, 43 S.Ct. 689, 67 L.Ed. 1186 (1923). Confronting such a weighty determination, plaintiffs pitch their claim for a preliminary injunction essentially upon two propositions, both vital to their suit:

(1) enlargement of the Stewart Airport requires approval by the Secretary of Transportation under the AADA; and

(2) there having been no such approval, the State may not seize title to the lands in question for projected airport development.

The first of these premises is probably wrong. However that is decided, the second seems more clearly erroneous. The resulting weakness of plaintiffs' case on the merits defeats their motion, especially since the balance of the equities does not appear to lean to their side.

■ It seems to be common ground that the AADA builds and expands upon the Federal Airport Act of 1946, 60 Stat. 170. How far the 1970 Act departs from the earlier one is sharply disputed. The briefs are long and studious on this. It seems sufficient for purposes of the pending motion to state briefly the court's pertinent observations and conclusions:

(1) It is undisputed that under the 1946 Act the States retained their sovereign power to build and enlarge airport facilities without ob-

---

3. Plaintiffs' Memorandum in Support of Motion for Preliminary, Injunction 10.

taining leave from any federal official or agency.

(2) Federal approval has been required, however, as a condition to federal funding. This was true under the 1946 Act. It remains true.

(3) While the 1970 Act expanded the concerns of the Federal Government and the roles of the Secretary of Transportation, it did not preempt state authority to construct and enlarge airports. There are traces of statutory language that might be read literally to support plaintiffs' contrary view.[4] Such a reading is strained and artificial, however. There is on the other side fairly explicit and weighty legislative history opposed to the theory of preemption.[5] And there is in the total picture no persuasive basis for reading the 1970 Act as making the kind of sharp, controversial departure plaintiffs would find in it. Cf. Florida Lime and Avocado Growers v. Paul, 373 U.S. 132, 142, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963).

For the reasons thus outlined, the court would reject what plaintiffs tender as their first indispensable premise: that airport development, without federal money, may not proceed in the absence of federal authorization. As things stand now, the State has announced its readiness to proceed with its own funds, and has appropriated substantial sums for the purpose. There is no serious doubt that the State desires and will seek federal funds. For that, federal approval of the project will be necessary. It does not follow, however, that the enterprise may not be commenced—or, for that matter, completed if necessary—without authorization by the Secretary of Transportation.

■ It may be noted that the position of the state officials on this subject is shared by the Secretary of Transportation. This contemporaneous judgment of the responsible administrator, while not conclusive, is a weighty one. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Power Reactor Development Co. v. Int. Union of Electricians, 367 U.S. 396, 408, 81 S.St. 1529, 6 L.Ed.2d 924 (1961).

■■ Even if plaintiffs are correct, however, on their first proposition—even if the Stewart development could not go forward without Secretary Volpe's blessing—the injunction now sought would not be justified. If it has not been approved, the proposed development certainly has not been disapproved. Indeed, the plans themselves have not been formulated with anything like finality. The State, concerned about a scarce resource (large tracts of accessible and relatively uninhabited land), is not less free to plan for contingencies than are other enterprises of smaller public moment. There is clear ground for a responsible judgment that the Stewart area is today "one of the last viable" alternatives for jet airport facilities of the kind evidently required in the near future. As prices rise and options vanish, the State has power to act rationally upon probabilities if certainties are not available. The State may take more than it is positive it will need; it may, given the limits of human foresight, take land for which a need is reasonably predicted but which

---

4. Plaintiffs rely upon 49 U.S.C. § 1716(c)(1), which says: "All airport development projects shall be subject to the approval of the Secretary [of Transportation] * * *." But this language is identical in all relevant respects with that appearing in the earlier Act: "All such [airport development] projects shall be subject to the approval of the Administrator [of Civil Aeronautics] * *." Federal Airport Act of 1946, ch. 251, § 9(d), 60 Stat. 175. It seems clear that the reference in the 1970 Act, like that in the 1946 Act, is to *federally funded* projects.

5. See Conf.Rep.No. 91–1074, 91st Cong., 2d Sess. (1970); H.R.Rep.No.91–601, 91st Cong., 2d Sess. (1969). Both documents are contained in 1970 U.S.Code Cong. & Admin.News 3047.

eventually proves unnecessary for its projected purpose. Cf. United States v. Bowman, 367 F.2d 768, 770 (7th Cir. 1966); Chapman v. Public Utility Dist. No. 1 of Douglas Co., Wash., 367 F.2d 163, 168 (9th Cir. 1966); Wilson v. United States, 350 F.2d 901, 907 (10th Cir. 1965). See also Rindge Co. v. Los Angeles County, *supra*, 262 U.S. at 707, 43 S.Ct. 689. Accordingly, it is permissible, at least so far as the Federal Constitution and the AADA are concerned, for the State Legislature to authorize and pay for the taking of land projected as enlarged airport facilities where the projection includes a hope, or even a need, for federal approval and money.[6] Indeed, the federal statute plaintiffs invoke embraces the prospect of just such an order of events. Under the AADA, a state agency must have title to the land in question or an assured expectation of acquiring title as a condition precedent to the Secretary's approval. Section 16 (c) of the statute provides in pertinent part, 49 U.S.C. § 1716(c):

"* * * No airport development project may be approved by the Secretary with respect to any airport unless a public agency holds good title, satisfactory to the Secretary, to the landing area of the airport or the site therefor, or gives assurance satisfactory to the Secretary that good title will be acquired."

It appears, in a word, that the AADA, like more general principles of prudent management, leaves the State entirely free, if not obligated, to acquire land for airport development before (if not altogether without) federal approval.[7]

### III.

Plaintiffs' unpromising case on the merits is not enhanced for present purposes by the balance of the equities. They argue that the taking of title to the affected land will have irrevocable consequences—making it impossible for the owners to plan confidently, transforming them into tenants at sufferance, even obliterating their standing to fight the proposed airport. Such assertions, by no means weightless, have a large admixture of exaggeration and inaccuracy. As to planning, the uncertainty is a troublesome fact however the present motion goes. Defendant MTA has promised to allow two years or so for people to move if necessary and make other adjustments. The divestiture of title cannot impair the standing plaintiffs may now claim in this court. Their speculations about how it might affect state actions they have not chosen to bring is not a concern here.

The plaintiff towns and organizations foretell a variety of hurts from the proposed airport expansion. Such things may conceivably be important in determining whether there should be a final decree (or perhaps a more suitable decision elsewhere) barring the expansion. They are not strong arguments for the extraordinary relief now sought *pendente lite*.

There appear to be substantial equities on the side of the State. Land prices are rising. The announced Stewart program seems to have enhanced this overall trend in the affected area. The land involved is sparsely occupied at

6. The feelings of the electorate—including those whose lands are taken as well as those whose taxes pay the bill—are outside our province. The subject bears this fleeting mention, however, if only as a reminder that there may still be forces more apt than lawsuits for deciding what lands should be taken, where airports should be built, and matters of like nature.

7. There is an argument that the proposed taking is excessive because 9,000 acres will not be needed. The materials before

the court, while not sufficient for certainty, tend to refute this contention. Plaintiffs add to their more careful and substantial points a frivolous suggestion that MTA, specifically designated in the state statute, is proceeding *ultra vires* by acting thereunder.

Finally, the court notes among the miscellaneous subjects of this footnote, plaintiffs' claim that the federal defendants, Secretary Volpe and FAA Director Schaeffer, should be enjoined from making study grants to the State under the AADA. This, too, is unsubstantial.

present. It makes evident sense to take it and set it aside now for airport use rather than to wait for a time when homes and other buildings will need to be razed and other intervening interests will have to be bought. In sum, the taking of title now has obvious justifications in terms of prudence and fairness. Especially when considered with the merits of the case, the opposed claims of hardship and threatened hardship fall short of making a compelling case for plaintiffs.

## IV.

Defendants Louis J. Lefkowitz, the State's Attorney General, Theodore W. Parker, State Commissioner of Transportation, Richard Dunham, State Budget Director, and Arthur Levitt, State Comptroller move to dismiss the complaint, evidently on the ground of sovereign immunity. Perhaps because it is a matter of no real consequence, the subject is not stunningly briefed on either side; the MTA (which advisedly makes no similar motion) and the basic issues in the case will remain before the court no matter how this question is resolved. In any event, the motion will be denied.

The attempt to enjoin individual state officers from acting unconstitutionally is not barred by sovereign immunity. See Ex parte Young, 209 U.S. 123, 159–160, 28 S.Ct. 441, 52 L.Ed. 714 (1908); Knight v. State of New York, 443 F.2d 415 (2d Cir., 1971). Whatever its ultimate fate on the merits, plaintiffs have launched such an attempt here. It may be that portions of their complaint could be excised as against the state movants because of sovereign immunity. Cf. Citizens Committee for Hudson Valley v. Volpe, 297 F. Supp. 809 (S.D.N.Y.1969). But the motion is to dismiss the complaint in its entirety, and the surgical procedure for this lengthy complaint would be at best messy and unhelpful.

Plaintiffs' motion is denied. The motion to dismiss is also denied.

It is so ordered.