481 F.2d 450
 TOWN OF NEW WINDSOR et al., Plaintiffs-Appellees,
v.
William J. RONAN et al., Defendants-Appellants.
METROPOLITAN TRANSPORTATION AUTHORITY et al., Defendants-Appellants,
v.
John A. VOLPE, United States Secretary of Transportation,
and John H. Shaffer, Administrator of the Federal
Aviation Administration, Defendants-Appellees.
 Nos. 866, 867, Dockets 73-1442, 73-1472.
 United States Court of Appeals,
Second Circuit.
 Argued May 30, 1973.
Decided June 28, 1973.
 
 John R. Hupper, New York City (Cravath, Swaine & Moore, and Norman J. Itzkoff, New York City, of counsel), for defendants-appellants Metropolitan Transp. Authority and the members thereof.
 Daniel M. Cohen, Asst. Atty. Gen., New York City (Louis J. Lefkowitz, Atty. Gen., of N. Y., of counsel), for defendants-appellants Theodore W. Parker, Richard Dunham, and Arthur Levitt.
 David Sive, New York City (Winer, Neuburger & Sive, and John S. Stillman, New York City, of counsel), for plaintiffs-appellees Town of New Windsor and others.
 Daniel Riesel, Asst. U. S. Atty., New York City (Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., and Daniel H. Murphy, II, Asst. U. S. Atty., New York City, of counsel), for defendants-appellees John A. Volpe and John H. Shaffer.
 Counties of Orange, New York and Dutchess, New York, by Peter G. Striphas, Atty., County of Orange, Goshen, N. Y., and John M. Kennedy, Atty., County of Dutchess, Poughkeepsie, N. Y., as amici curiae.
 Before MOORE, FRIENDLY and FEINBERG, Circuit Judges.
 MOORE, Circuit Judge:
 
 I.
 
 1
 Defendant-appellant New York State Metropolitan Transportation Authority and the individual members thereof,[1] both as members and individually (hereinafter, "MTA"), appeal from a judgment of the United States District Court for the Southern District of New York, Sylvester J. Ryan, Judge, entered on February 14, 1973, as subsequently amended on March 8, 1973. This judgment, inter alia, granted summary judgment to defendants-appellees, John A. Volpe, United States Secretary of Transportation, and John H. Shaffer, Administrator of the Federal Aviation Administration (hereinafter, "Federal defendants") and dismissed MTA's cross-claim against the Federal Aviation Administrator.
 
 
 2
 By its cross-claim the MTA sought a declaration that Paragraph 7L of a deed, by which the United States transferred ownership of most of the former Stewart Air Force Base (Stewart AFB) to the MTA, does not require that the Federal Aviation Administration (FAA) must make any determination before the MTA can lawfully proceed with the proposed extension of Stewart Airport runway 9-27. The cross-claim further sought a determination that in case of a dispute between the FAA and the MTA as to whether a proposed alteration in the airport which, in the language of Paragraph 7L, "might adversely affect the safety, utility or efficiency of the Airport," the dispute should be decided in court, not unilaterally by the FAA. Finally, the cross-claim requested a ruling that any determination concerning the proposed runway extension would not constitute major federal action within the meaning of the National Environmental Policy Act of 1969. The cross-claim further sought a determination that the proposed extension of Stewart Airport runway 9-27 did not require the prior approval of the FAA.
 
 
 3
 Defendants-appellants Theodore W. Parker, individually and as Commissioner of the Department of Transportation of the State of New York, Richard Dunham, individually and as Director of the Budget of the State of New York, and Arthur Levitt, individually and as Comptroller of the State of New York (the "State defendants"), also appeal from the amended judgment.
 
 
 4
 In July, 1971, four individuals who own land in the vicinity of Stewart Airport,[2] several environmental groups,[3] and certain towns also in the vicinity of the airport[4] commenced this action seeking preliminary and permanent injunctive relief enjoining the appropriation in the name of the People of the State of New York of approximately 9,000 acres of land adjacent to Stewart Airport for use in the proposed expansion and development of that facility.[5]
 
 
 5
 In an opinion dated August 12, 1971, the district court, per Judge Marvin E. Frankel, denied plaintiffs' motion for a preliminary injunction. 329 F.Supp. 1286 (S.D.N.Y.1971). On August 13, 1971, appellants caused title to this land to vest in the People of the State of New York.[6]
 
 
 6
 In September, 1971, the MTA moved for an order dismissing all seven claims contained in plaintiffs' complaint on the ground that none of them states a claim upon which relief can be granted. The Federal defendants made a similar motion in December, 1971.
 
 
 7
 In January, 1972, before any decision had been reached on these motions,[7] plaintiffs moved for leave to add an additional claim to their complaint (the "Eighth Claim"). This Eighth Claim sought injunctive relief to block the allegedly unlawful extension of Stewart Airport runway 9-27 by the MTA.[8] MTA and the State defendants opposed this motion, which was referred to Judge Ryan, before whom the motions to dismiss the first seven claims were pending.
 
 
 8
 In February, 1972, the FAA formally announced that under its interpretation of Paragraph 7L of the deed dated October 16, 1970, which transferred Stewart Airport to the MTA, the MTA was required to seek FAA approval for all proposed changes to the airport which might adversely affect the facility's safety, utility, or efficiency. The FAA specifically noted that the proposed extension of runway 9-27 was an airport alteration which would require such approval. The FAA further declared that such determinations generally, and the determination with respect to the runway extension in particular, would be actions subject to the requirements of the National Environmental Policy Act, and that the determination must therefore be accompanied by an environmental impact statement.[9] Representations have been made (Appellee's Brief, p. 30) that such a statement is being or has been prepared for presentation shortly.
 
 
 9
 By order entered April 12, 1972, Judge Ryan granted plaintiffs leave to file their Eighth Claim and stayed all proceedings on the first seven claims until a determination had been made on the Eighth Claim.[10] MTA then answered the Eighth Claim and cross-claimed against the FAA seeking a judicial construction of the disputed language contained in Paragraph 7L of the deed.
 
 
 10
 In August, 1972, the MTA moved for summary judgment on so much of plaintiffs' Eighth Claim and its cross-claim as present the question of whether Paragraph 7L requires that the FAA make "certain determinations before the MTA can proceed with planned changes or alterations to Stewart Airport, including its plans to extend runway 9-27 at that airport." After answering the Eighth Claim and the MTA's cross-claim, the Federal defendants also moved for summary judgment, as did plaintiffs; oral argument was heard in October, 1972. Judge Ryan's decision granted summary judgment for the Federal defendants and plaintiffs; Judge Ryan also certified this judgment for immediate appeal under F.R.Civ.P. 54(b).
 
 II.
 
 11
 The facts with which we are concerned are uncomplicated. Stewart Airport is located in Orange County, New York, fifty-five miles north of New York City. From 1930 to 1942 it was operated as a municipal airport by the city of Newburgh, New York. From 1942 to March, 1970, it was operated as a military airfield; prior to its transfer to the MTA, this facility was known as Stewart AFB.
 
 
 12
 In the fall of 1969 the Department of Defense (DOD) announced that Stewart AFB would be closed and the military units stationed there would be relocated or deactivated. Shortly thereafter, the MTA requested that DOD transfer Stewart AFB to it so that the facility might be developed as a public airport. On February 12, 1970, DOD executed a revocable license permitting MTA to operate Stewart AFB as a public airport pending formal transfer of the property.
 
 
 13
 On June 4, 1970, the MTA submitted its formal application to the General Services Administration (GSA) requesting the transfer of Stewart AFB. Pursuant to the Surplus Property Act of 1944,[11] the application was referred to the FAA. The FAA subsequently issued a report recommending that Stewart AFB be transferred for no monetary consideration to the MTA for public airport use.
 
 
 14
 *****
 
 
 15
 * * *
 
 
 16
 The actual transfer took place on October 16, 1970, when GSA conveyed the property to the MTA by quitclaim deed.
 
 
 17
 The dispute among the parties involves the interpretation of the following language from the October 16, 1970, deed:
 
 
 18
 7L. And, that the grantee will keep up to date at all times an airport layout map of the Airport at which the property described herein is located showing:
 
 
 19
 [airport boundaries, structures, and facilities, including all proposed changes to such boundaries, structures, and facilities, and all nonaviation areas and structures and their uses]
 
 
 20
 and such airport layout map and each amendment, revision, or modification thereof, shall be subject to the approval of the FAA, which approval shall be evidenced by the signature of a duly authorized representative of the FAA on the face of the airport layout map, and the grantee will not make or permit the making of any changes or alterations in the Airport or any of its facilities other than in conformity with the airport layout map as so approved by the FAA, if such changes or alterations might adversely affect the safety, utility, or efficiency of the Airport. Notwithstanding the foregoing, the Grantee shall provide the Department of Defense with one copy of any preliminary and subsequently approved airport layout plan, or associated Master Plan or land use plan and obtain through the FAA the prior concurrence of the Department of Defense for any proposed airport development, improvement, or modification which concurrence shall relate only to protection of the interests of the United States in National Defense involving the United States Military Academy.
 
 III.
 
 21
 MTA disputes the FAA's interpretation of Paragraph 7L which was upheld in the district court. The MTA asserts that there is no language in the deed which, by its terms, confers upon the FAA the power to disapprove changes or alterations in the airport which might affect the safety, utility, or efficiency of the airport.
 
 
 22
 The MTA concedes that Paragraph 7L requires that it keep the Stewart Airport layout map up-to-date and that "each amendment, revision, or modification thereof shall be subject to the approval of the FAA which approval shall be evidenced by the signature of a duly authorized representative of the FAA." To this point the MTA and the FAA are in full agreement on the meaning of Paragraph 7L.
 
 
 23
 It is with respect to the provisions immediately following the above-quoted language that this case has arisen. Paragraph 7L provides that:
 
 
 24
 the grantee will not make or permit the making of any changes or alterations in the Airport or any of its facilities other than in conformity with the airport layout map as * * * approved by the FAA, if such changes or alterations might adversely affect the safety, utility, or efficiency of the Airport. (emphasis added)
 
 
 25
 The MTA urges that Paragraph 7L means that while all changes to the airport layout map must be approved by an FAA official, changes to the airport itself are not subject to such approval. It is the MTA's position that when the FAA believes that a planned MTA airport alteration will adversely affect the facility's safety, utility, or efficiency, the FAA must seek a judicial determination that such change will, in fact, have such adverse effect on the airport. The MTA's argument turns on the fact that the phrase "if such changes * * * might adversely affect * * * the Airport" stands alone and does not include words like "as determined by the FAA" or other words which would indicate that the FAA alone is the party which is to decide if a proposed change in the airport will be "adverse."
 
 
 26
 The MTA does not contend that the deed empowers it to make alterations in the airport which will in fact adversely affect its safety, etc.; rather, its position is that since the deed does not give the FAA the power to make this determination, such determinations must be made by a court. The crux of the MTA position is that with respect to Stewart Airport, the FAA is merely the agent of the grantor responsible for insuring that the terms of the deed are fully observed. The role of the FAA in this situation, says the MTA, is not the same as its role as the federal agency charged with regulation of the technical aspects of domestic aviation. Thus, with respect to disputes over the impact of changes proposed for the airport, the MTA asserts that the FAA simply stands in the shoes of the grantor and has only the status of an ordinary grantor, who may raise questions, but not decide them. This means, according to the MTA, that the FAA must utilize the courts and not its internal decision-making machinery, to reconcile differences which arise out of the MTA's plans for developing the airport.
 
 
 27
 The MTA interpretation of Paragraph 7L is that where that paragraph mentions FAA approval, it is referring solely to the obligation of the MTA to keep up-to-date the airport layout map. This requirement, says the MTA, is merely a notice requirement included in the deed by the FAA so that it may fulfill the advisory role regarding airport construction which Congress has created for it with respect to non-federally financed airport improvements.[12] The maintenance of an up-to-date layout map and strict conformity with it are requirements of the Congressionally enacted Federal Aid Airport Program (FAAP), but the MTA stresses that Stewart is now funded solely by New York State and does not participate in any way in FAAP. Therefore, concludes the MTA, there is no statutory requirement that an up-to-date airport layout map be maintained by it.
 
 
 28
 MTA further argues that the FAA interpretation of Paragraph 7L does not reflect the intention of the parties, since the MTA would not have agreed to give the FAA control of MTA plans for the development of Stewart Airport. As evidence of its intention to avoid provisions granting such "veto powers", the MTA asserts that it specifically rejected an attempt by the Department of Defense to insert such a clause in the deed. In a letter written just nine days before the scheduled transfer of Stewart AFB, the MTA's Secretary and Counsel, Robert R. Prince, notified DOD that its proposed addition to the deed was "so extreme * * * that the transfer of title by the 15th of this month is virtually impossible." Prince's letter contained an enumeration of Prince's view of some of the unacceptable aspects of the proposed addition and concluded, "We cannot possibly abide by these conditions."
 
 
 29
 The Prince letter had been prompted by the proposal to include the following language at the end of Paragraph 7L:
 
 
 30
 Notwithstanding the foregoing, the Grantee shall provide the Department of Defense with one copy of any preliminary and subsequently approved airport layout plan, or associated Master Plan or land use plan and obtain through the FAA the prior concurrence of the Department of Defense for any proposed airport development, improvement, or modification.
 
 
 31
 The ultimate resolution of this dispute was achieved by adding to the above sentence the following clause:
 
 
 32
 which concurrence shall relate only to protection of the interests of the United States in National Defense involving the United States Military Academy.
 
 
 33
 While there can be little question that Prince strenuously opposed what he characterized as the DOD's proposed right of "veto", the argument that the MTA specifically rejected such a veto is weakened considerably when the added language is analyzed. The deed, as finally accepted by the MTA, did not bar the DOD from exercising "veto" authority; it simply limited the interests which could be raised in justifying such a veto to those relating to the nearby Military Academy at West Point. Moreover, objections to a veto by DOD do not necessarily imply similar objection to a requirement of approval by a civilian agency which presumably would share MTA's interest in commercial development of the airport.
 
 
 34
 The MTA presents a somewhat more substantial argument when it points out that when the drafters of the deed[13] did intend to give the FAA a veto power, they were able to do so in very unambiguous language. There are a number of clauses throughout the deed which grant the FAA the exclusive authority to make certain decisions. These provisions include such phrases as the following, all of which refer to the FAA: "in the opinion of", "as determined by", "[with] the consent of", "as deemed reasonably necessary by", and "unless authorized by." Each of these phrases unquestionably grants to the FAA the exclusive power to make a particular decision. The MTA claims that since no such phrase was used in Paragraph 7L, that provision should not be read to grant similar power to the FAA with respect to changes in the airport.
 
 
 35
 As an additional point, the MTA notes that during the six month period from March, 1970, when Stewart AFB was vacated by the Air Force, until October, 1970, when title was formally transferred to New York State, the MTA operated Stewart Airport as a licensee. One of the conditions of such operation, which was to be complied with "for the period prior to delivery of the instrument or instruments of transfer conveying legal title," reads as follows:
 
 
 36
 b. Limitations on Major Structural Changes
 
 
 37
 The transferee shall not make, permit or suffer any addition, improvements, or alterations to the airport property which constitute any major structural change or changes unless such change or changes * * * are made with the prior written consent of the Administrator of the [FAA].
 
 
 38
 The MTA notes that this provision, which by its terms was applicable only until the MTA took title to Stewart Airport, leaves no doubt as to its meaning. Since no similar language is found in the documents of title, the MTA argues, it is obvious that the FAA itself did not intend to retain this approval authority.
 
 IV.
 
 39
 It is certainly true that Paragraph 7L of the form deed could have been phrased more precisely. We conclude, however, that the disputed language means what the FAA and the district court have said that it means.
 
 
 40
 Paragraph 7L imposes upon the MTA the clear duty not to
 
 
 41
 make or permit the making of any changes in the Airport or any of its facilities other than in conformity with the airport layout map as * * * approved by the FAA * * *.
 
 As for the clause
 
 42
 if such change or alteration might adversely affect the safety, utility, or efficiency of the Airport
 
 
 43
 we conclude that this clause refers to an administrative determination by the FAA regarding the adverse effects of the proposed change or alteration. Implicit in this language is the further provision that FAA approval shall not be unreasonably withheld. There is no support for the MTA's position that where the parties differ over the impact of a change, no map approval is required and the FAA must obtain a preliminary injunction to prevent the MTA from proceeding.
 
 
 44
 The MTA interpretation of the deed wholly ignores the function of the layout map. Its purpose is not to be a decorative object hanging on the wall at the airport so that the public may view it and obtain information therefrom as to the nature and extent of the airport. To the contrary, it serves the definite purpose of showing what airport layout has been approved by the FAA as well as which "proposed changes" have been so approved. The necessity for the signature of a duly authorized representative is to evidence FAA approval of such proposed changes.
 
 
 45
 The layout map shows changes approved by FAA. As to changes "other than in conformity with the airport layout map," the MTA has agreed not to make them if they might have an adverse effect.
 
 
 46
 As discussed supra, the MTA is correct in saying that there is no statutory requirement that the FAA approve changes at Stewart Airport. Nevertheless, it is clear that such an approval requirement has been included as a condition of the deed which transferred the airport to New York State.
 
 
 47
 Authority for imposing such a condition is found in the Surplus Property Act of 1944:
 
 
 48
 In making any disposition of surplus property under this subsection, the disposal agency is authorized, upon the request of the Administrator of the Federal Aviation Administration * * * to include any additional terms, conditions, reservations and restrictions, if the Administrator * * * determines that such omission or inclusion is necessary to protect or advance the interests of the United States in civil aviation or for national defense.
 
 50 U.S.C. App. Sec. 1622(g)(3)
 
 49
 Thus, although Congress has not required that the FAA approve alterations to Stewart Airport, it has authorized the inclusion of such a clause in the deed of transfer as a condition of the transfer of surplus airport property. And it is very clear that the FAA has included such a clause in the quitclaim deed of October 16, 1970.
 
 
 50
 The MTA would place upon the courts the burden of determining in the first instance whether there might be adverse effects from proposed changes to the airport.
 
 
 51
 There can be no question that by creating the FAA, Congress has established what it believes to be an "expert" agency. It has granted that agency broad powers to regulate the technical aspects of aviation-ranging from aircraft design[14] and maintenance[15] to airport certification[16] and airways navigation.[17]
 
 
 52
 In this context it is clear that the FAA is well able to make the initial determination as to the adverse impact of any of the MTA's plans for Stewart Airport.
 
 
 53
 Furthermore, as a practical matter, advance approval by the FAA would seem desirable. Were the MTA to be allowed to proceed without approval, millions of dollars might be wasted in the event that its modifications were disapproved.
 
 
 54
 Review by the courts should be limited to complaints after agency action that the agency has acted in contravention of the Administrative Procedure Act.[18]
 
 
 55
 We express no view on the question of whether the administrative decisions of the FAA under Paragraph 7L of the deed should be deemed "major Federal actions significantly affecting the quality of the human environment," within the meaning of the National Environmental Policy Act (42 U.S.C. Sec. 4332(2) (C)).
 
 
 56
 The decision of the district court is affirmed.
 
 
 
 [1]
 The individual members of the Metropolitan Transportation Authority include William J. Ronan, Lawrence R. Bailey, Leonard Braun, William L. Butcher, Donald H. Elliot, Justin N. Feldman, Harold L. Fischer, Mortimer J. Gleeson, Frederic B. Powers, Eben W. Pyne, and William A. Shea
 
 
 [2]
 The individual landowners are John A. Flannery, Agnes Schibanoff, Walter Strassburg, and William Shafer
 
 
 [3]
 The environmental groups include Stewart Area Protective Association, Rock Tavern Rod and Gun Club, Stop-The-Jetport Committee, and Hudson River Valley Council
 
 
 [4]
 The original plaintiff towns include New Windsor, Cornwall, and Montgomery. Intervening plaintiffs include the Towns of Newburgh, Waywayanda, and Greenville, and the Village of Maybrook
 
 
 [5]
 The MTA was authorized to proceed with the Stewart Airport expansion by the New York State Legislature in June, 1971. See Chapters 472-73, New York Session Laws, 1971
 
 
 [6]
 The MTA was served with a summons and complaint in a New York State court action on August 10, 1971. That suit also sought preliminary and permanent injunctive relief enjoining appellants from appropriating this land. Appellants' cross-motion to dismiss for failure to state a cause of action was granted by Supreme Court, Orange County. That decision was affirmed by the Appellate Division, Second Department. County of Orange v. Metropolitan Transportation Authority, 71 Misc.2d 691, 337 N.Y.S.2d 178 (Sup. Ct.Orange County 1971), aff'd without opinion, 39 A.D.2d 839, 332 N.Y.Supp. 2d 420 (2d Dep't. 1972)
 
 
 [7]
 These motions remain sub judice
 
 
 [8]
 Runway 9-27 was 7,000 feet long when the MTA acquired Stewart. It was effectively lengthened 1,000 feet before the FAA made its position on such changes at Stewart known to the MTA
 
 
 [9]
 42 U.S.C. Sec. 4321 et seq
 
 
 [10]
 After the FAA formally declared its position on the interpretation of Paragraph 7L, the MTA withdrew its opposition to plaintiff's motion to add the Eighth Claim so that the issue could be expeditiously considered by the court
 
 
 [11]
 Surplus Property Act of 1944, 58 Stat. 765 as amended:
 50 U.S.C. App. Sec. 1622
 (1) Notwithstanding any other provisions of this Act [former sections 1611-1614, 1615-1622, 1623-1632 and 1633-1646 of this Appendix], and [any?] disposal agency designated pursuant to this Act [such sections] may, with the approval of the Administrator of General Services, convey or dispose of to any State, political subdivision, municipality, or tax-supported institution, without monetary consideration to the United States, but subject to the terms, conditions, reservations, and restrictions hereinafter provided for, all of the right, title, and interest of the United States in and to any surplus real or personal property (exclusive of property the highest and best use of which is determined by the Administrator of General Services to be industrial and which shall be so classified for disposal without regard to the provisions of this subsection) which, in the determination of the Administrator of the Federal Aviation Agency, is essential, suitable, or desirable for the development, improvement, operation, or maintenance of a public airport as defined in the Airport and Airway Development Act of 1970 [section 1701 et seq. of Title 49] or reasonably necessary to fulfill the immediate and foreseeable future requirements of the grantee for the development, improvement, operation, or maintenance of a public airport, including property needed to develop sources of revenue from nonaviation businesses at a public airport.
 (2) Except as provided in paragraph (3) of this subsection, all property disposed of under the authority of this subsection shall be disposed of on and subject to the following terms, conditions, reservations, and restrictions:
 (3) In making any disposition of surplus property under this subsection, the disposal agency is authorized, upon the request of the Administrator of the Federal Aviation Agency, the Secretary of the Army, or the Secretary of the Navy, to omit from the instrument of disposal any of the terms, conditions, reservations, and restrictions required by paragraph (2) hereof, and to include any additional terms, conditions, reservations, and restrictions, if the Administrator of the Federal Aviation Agency, the Secretary of the Army, or the Secretary of the Navy determines that such omission or inclusion is necessary to protect or advance the interests of the United States in civil aviation or for national defense.
 
 
 [12]
 See, FAA Advisory Circular AC-150/5310-2, September 19, 1968
 
 
 [13]
 FAA Handbook 5150.2, Federal Surplus Property for Public Airport Purposes, contains in its appendix 3 the standard form deed used to transfer such property. Paragraph 7L of that deed is identical to Paragraph 7L of the Stewart Airport deed, except that the Stewart deed includes the additional sentence added by DOD regarding the United States Military Academy, discussed supra
 
 
 [14]
 49 U.S.C. Sec. 1421(a)(1) (1970)
 
 
 [15]
 49 U.S.C. Sec. 1421(a)(3) (1970)
 
 
 [16]
 49 U.S.C. Sec. 1432 (1970)
 
 
 [17]
 49 U.S.C. Sec. 1348 (1970)
 
 
 [18]
 5 U.S.C. Sec. 551 et seq. (1970)