*65 OPINION OF THE COURT
Simons, J.
Petitioner Village of Westbury instituted this CPLR article 78 proceeding seeking relief from respondents’ alleged violation of the State Environmental Quality Review Act (ECL art 8). Specifically, it requests that the negative declaration issued by the respondent Department of Transportation for reconstruction of the interchange of the Northern State Parkway and the Meadowbrook State Parkway be annulled and that the matter be remitted to DOT for preparation of environmental impact statement (EIS) after consideration of the cumulative environmental effects of the interchange project and a proposed widening of a section of the Northern State Parkway east of it. Supreme Court dismissed the petition but the Appellate Division reversed its judgment, annulled the negative declaration and remitted the matter to the Department for further consideration. Construction has been enjoined until completion of proceedings complying with SEQRA.
We granted respondents leave to appeal so that we might decide whether (1) the interchange reconstruction and the proposed widening of Northern State Parkway to the east of it must be considered together when determining whether the actions of DOT will have a significant effect on the environment (see, 6 NYCRR 617.11 [a]; 17 NYCRR 15.11 [a]), (2) the regulations of the Department of Environmental Conservation *66 or those of the Department of Transportation are to control that determination and (3) the proceeding is timely. Our review of these questions is limited to deciding whether DOT’s determination was made in violation of lawful procedures, was affected by an error of law or was arbitrary or capricious or an abuse of discretion (see, CPLR 7803 [3]; Chinese Staff & Workers Assn. v City of New York, 68 NY2d 359, 363). It is not our role to weigh the desirability of any proposed actions or choose among alternatives but only to insure that the agency has satisfied the substantive and procedural requirements of SEQRA and of the regulations implementing it (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, .416). For the reasons which follow, we conclude that it has not and that the Appellate Division order should be affirmed.
I
The Northern State Parkway is a limited-access parkway running generally east and west and serving the northern corridor of Long Island. It presently consists of eight lanes of traffic west of the interchange and four lanes east of it. The Meadowbrook State Parkway is a six-lane limited-access parkway running generally north and south and extending from the interchange with the Northern State Parkway southerly to Jones Beach State Park. The interchange is located in Nassau County, principally in petitioner Village of Westbury.
Reconstruction was undertaken because the design of the exit and entry ramps of the interchange is confusing, requiring drivers in some instances to leave one parkway to obtain access to the other, and the road capacity, particularly east of the interchange, is inadequate and produces excessive traffic congestion. As a result of these conditions, the accident rate in the area is more than six times the State-wide average.
The proposed reconstruction was started in June 1988 and scheduled to be completed in 1991. It will change the configuration of the interchange, providing new entrance and exit ramps, and include a new connection between the Northern State Parkway and the Meadowbrook State Parkway. The reconstruction will also provide two additional lanes (a total of four in each direction) for traffic on the Northern State Parkway for a short distance east of the interchange. Although these additional lanes on the east end of the interchange will be built as part of the interchange project, they will not be used until after Northern State Parkway is wid *67 ened from the interchange east to Wantagh State Parkway. They serve no purpose independent of the widening project, so appropriate traffic control devices will prevent their use until the widening project is completed.
The widening project is tentatively scheduled to begin after completion of the interchange project and funding for it has been programmed for 1991. It will result in the continued expansion of the Northern State Parkway to four lanes in each direction east of the easterly limit of the interchange project. The projected lane alignment will match the widened alignment of the Northern State Parkway built as part of the interchange project. When the widening east of the interchange is complete, the traffic control devices preventing use of the additional lanes built during the interchange project will be removed and maximum capacity and traffic flow will be achieved.
In making its environmental review, DOT relied on the provisions of SEQRA and its own implementing regulations (see, ECL art 8; 17 NYCRR part 15). Pursuant to its regulations, DOT characterized the project as a non-Type II action, which required preparation of an environmental assessment to determine whether an environmental impact statement was needed (see, 17 NYCRR 15.6). The draft environmental assessment, issued in November 1986, originally included a proposed alternative to widen the Northern State Parkway from four to eight lanes easterly of the interchange from the Meadowbrook Parkway to the Wantagh Parkway. Serious public objections to the construction were expressed by the Village of Westbury and others. The Village objected particularly to parts of the widening proposal, and the necessary closing or elimination of certain bridges in connection with it, and the rerouting of traffic through the Village during construction of this extended improvement. Consequently, in June 1987 DOT issued a final report/environmental assessment which revised the easterly limit of the project by shifting it about 1,200 feet west towards the interchange. DOT determined the project, as so modified, would have no significant environmental impact and issued a negative declaration.
Petitioners contend this declaration must be annulled because it was issued without considering the cumulative environmental impact of both the interchange and the projected construction to widen Northern State Parkway, as required by applicable regulations, was arbitrary and capricious and an abuse of discretion.
*68 II
Generally speaking, SEQRA charges State and local agencies with the responsibility of implementing the procedures and purposes it sets forth. To that end, they must determine first whether a proposed action may have a "significant effect” on the environment and, if it does, prepare or cause to be prepared an environmental impact statement in the manner set forth in the statute (ECL 8-0109 [2]). The idea is to insure investigation and study before proceeding so that "agency decision-makers — enlightened by public comment where appropriate — will identify and focus attention on any environmental impact of proposed action, that they will balance those consequences against other relevant social and economic considerations, minimize adverse environmental effects to the maximum extent practicable, and then articulate the bases for their choices.” (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 414-415, supra.) Inquiry starts with an assessment of the action and a determination of whether it "may have a significant effect” on the environment. If it might, an EIS is required. If the agency determines that the proposed action will not have a significant effect on the environment it issues a "negative declaration” (see, 6 NYCRR 617.2 [y]; 17 NYCRR 15.6 [b]).
The criteria for determining whether a proposed action "may have a significant effect” on the environment are set forth in the regulations (6 NYCRR 617.11; 17 NYCRR 15.11).* The agency must compare the impacts which may reasonably be expected from the proposed action with these criteria, in making its assessment. Relevant to this litigation, the agency must, in determining whether an action will have any of the consequences listed, consider reasonably related effects "including other simultaneous or subsequent actions which are: (1) included in any long-range plan of which the action under consideration is a part; (2) likely to be undertaken as a result thereof; or (3) dependent thereon” (6 NYCRR 617.11 [b]; 17 NYCRR 15.11 [b]).
*69 It is petitioner’s claim that respondents violated these regulations because DOT’s environmental review should have considered — together—the reconstruction of the interchange and the project to widen Northern State Parkway east of it; that when considered together, their environmental impact meets the criteria of the regulations requiring the preparation of an EIS. DOT claims that the two projects are separately conceived and serve separate purposes, one to eliminate a traffic hazard, the other to increase traffic capacity; they are not part of an area- or community-wide plan, as in Matter of Save the Pine Bush v City of Albany (70 NY2d 193) and Chinese Staff & Workers Assn. v City of New York (supra) and thus they need not be considered together.
We conclude that the widening of Northern State Parkway is the type of subsequent action contemplated by the regulations and that the environmental effects of the two projects should be considered together. The interchange construction is one part of a plan to alleviate the traffic congestion and capacity deficiencies of the Northern State Parkway at its interchange with Meadowbrook State Parkway and east of it. The other part of that plan is the widening project. The two are complementary components of the remedy for the Northern State Parkway’s traffic flow problems, sharing a common purpose, integrated and scheduled for consecutive construction. Thus, design of each is dependent on the other in that lane construction which will be undertaken as part of the interchange project has no independent utility without the subsequent widening of Northern State Parkway to the east. That being so, the regulations require the consideration of their combined effects even though they are not part of a single formalized plan (cf., Matter of Save the Pine Bush v City of Albany, supra; Chinese Staff & Workers Assn. v City of New York, supra).
The record contains ample evidence to support this conclusion. Notwithstanding DOT’s claim that the construction was undertaken to solve a safety hazard in the interchange, it appears that the purpose for the improvements was more broadly related to traffic congestion and the safety hazards resulting from it. Thus, DOT stated in its final design report/ environmental assessment that the interchange project was developed to "alleviate traffic congestion” and, referring to the interchange construction, that "[t]he inability of the facility to provide adequate traffic flow is a critical deficiency.” The *70 report also linked the two projects when it determined that "[t]he existing number of Northern State Parkway travel lanes (2 per direction), east of the interchange does not provide for efficient traffic flow. Current traffic volumes (3,500 vehicles during the peak hour) exceed the capacity of the facility at this location.”
DOT’S Informational Bulletins, distributed to the public, and written responses to questions from the public repeatedly identified the "traffic operation deficiencies” and "inadequate traffic flow problems”, listing "[d]aily traffic jams and capacity limitations” during rush hours at the interchange as "one of the major transportation problems on Long Island.” These Informational Bulletins concluded that part of the remedy for this problem is the construction of additional travel lanes on the Northern State Parkway east of the interchange. Corroboration is also found in the Nassau-Suffolk Transportation Improvement Programs for 1986-1991 and 1987-1992. Although these reports only purport to list priorities and project future programs, it is noteworthy that both identified the interchange and widening as "complement[ary]” projects designed to improve the over-all traffic flow on the Northern State Parkway.
Moreover, DOT has treated the two projects in a unified, interchangeable fashion, planning the design of the interchange and the widening of Northern State Parkway as part of the same plan, with the widening project likely to be undertaken as a result of, and dependent on, the interchange project. Thus, the interchange project includes the construction of two additional lanes for both the eastbound and westbound directions on the Northern State Parkway, lanes which have no utility except upon completion of the widening project. Only then will the additional lanes in the interchange be used, and maximum capacity and traffic flow achieved.
DOT maintains that all highway construction, by its nature, is interdependent and each project necessarily related to others. Thus, it contends that if petitioner prevails in its argument the future rehabilitation of one part of the highway system necessarily will require it to consider the impact resulting from all others contemplated in its geographic area.
We recognize that although highway projects in a particular area may be related in the broad sense, few given the uncertainties and economics of capital construction, may be said to be totally dependent on others. We do not suggest that the *71 cumulative effects of all tentative plans for an area must be measured fully in every case. Here, however, DOT sought to solve one localized problem caused by two predominant factors —the design of the interchange and the inadequate capacity of its highways — and the solution for each was related to the other. DOT’s reliance on the future widening of the Northern State Parkway in planning the interchange project establishes that the widening is, in the words of the regulations, a "subsequent action” "included in any long-range plan”, "likely to be undertaken as a result” of the interchange construction or "dependent” on it (see, 6 NYCRR 617.11 [b]; 17 NYCRR 15.11 [b]). Indeed, DOT’s various alternative proposals recognized that the two were related and it may not avoid consideration of their combined environmental effects simply by moving the limit line of the construction further west.
Ill
Petitioner contends further that on remittal DOT must evaluate the proposed action by means of the environmental criteria set forth in the DEC regulations rather than its own. DOT’s regulations were adopted pursuant to statutory authorization permitting agencies to establish additional procedures but requiring that the agency regulations be "consistent with [those] adopted by [DEC]” (see, ECL 8-0113 [3]; n, at 68). Petitioner maintains that as applied to this case DOT’s regulations are less protective of the environment than are those of DEC and, therefore, DEC’s must control.
Petitioner relies specifically on the classification of actions set forth in the two regulations. The DEC regulations provide for excluded, exempt, Type I, Type II and unlisted actions (6 NYCRR 617.2 [p], [q], [ii], Qj], [kk]). Petitioner maintains that under DEC’s rules this action is a Type I action because it involves the physical alteration of more than 10 acres (see, 6 NYCRR 617.12 [b] [6] [i]) and as such it "carries with it” the presumption that it is likely to have a significant effect on the environment (6 NYCRR 617.12 [a] [1]). Thus petitioner maintains an EIS must be prepared.
DOT does not classify its actions in the same way. Because of the nature of DOT’s responsibilities, it is concerned more with whether the activity involves direct action, funding or permit-issuing and with the integration of its procedures with the National Environmental Policy Act when, for example, Federal aid is received. Under DOT’s regulations, actions *72 other than exempt or excluded actions are divided into two categories: Type II which do not require an EIS, and actions other than Type II, which are more likely to require one. The latter corresponds to the Type I actions of DEC and are treated the same procedurally (17 NYCRR 15.1 [c] [2]; 15.6, and compare with 6 NYCRR 617.5 [b]). If a non-Type II action involves direct action, as here, the Department prepares an environmental assessment form and, after concluding the environmental assessment, either issues a negative declaration or prepares an EIS (see, 17 NYCRR 15.6).
DOT’s regulations contain no explicit presumption of significance similar to that provided in . the DEC regulations for Type I actions but it is not clear that the Department intended a difference in substance by this omission. In any event, DOT’s regulations provide that all actions which are non-Type II actions are to be processed "similar to” a Type I action under DEC regulations (17 NYCRR 15.1 [c] [2]) and that its regulations are to be applied in a manner not less protective of the environment than DEC’s (17 NYCRR 15.1 [d]). Thus, we agree with petitioner that upon reconsideration DOT should process the proposed action in the same way Type I actions are processed under DEC regulations and determine whether it has a significant effect on the environment.
IV
Finally, respondents contend this proceeding, commenced on December 17, 1987, is time barred because the Statute of Limitations started to run either on July 30, 1987, the date DOT finally approved the interchange project, or on August 7, 1987, the latest date DOT gave the required notice of the negative declaration to DEC, DOT’s own offices and the Nassau County Executive (see, 17 NYCRR 15.10). The Village maintains that the statute did not start to run until DOT served it with notice of the negative declaration, August 18, 1987, and therefore the proceeding is timely.
An article 78 proceeding must be commenced within four months "after the determination to be reviewed becomes final and binding upon the petitioner.” (CPLR 217.) A determination generally becomes binding when the aggrieved party is "notified” (see, Matter of Biondo v New York State Bd. of Parole, 60 NY2d 832, 834; see also, Matter of Martin v Ronan, 44 NY2d 374; Mundy v Nassau County Civ. Serv. Commn., 44 NY2d 352).
*73 DEC’S regulations provide that a negative declaration is not "final and binding” until the agency files it with "the chief executive officer of the political subdivision in which the action will be principally located” (6 NYCRR 617.10 [a] [2] [iii] [emphasis added]). DOT’S parallel regulation provides that a negative declaration is not "final and binding” until filed with "the chief executive officer of the appropriate political subdivision in which the action is located” (17 NYCRR 15.10 [a] [2] [v] [emphasis added]). Respondents contend that under either provision DOT’s filing obligation was complete when it served Nassau County: the Village was not entitled to a separate notice.
Notwithstanding the minor language differences, we construe both regulations the same and conclude DOT did not satisfy the notice requirements of either 6 NYCRR 617.10 (a) (2) (iii) or 17 NYCRR 15.10 (a) (2) (v) by filing its negative declaration with the Chief Executive Officer of Nassau County.
The purpose of the SEQRA notice requirement is to provide notice to the party or parties most likely to be affected by agency action. The Village of Westbury is more directly and obviously affected by the interchange project than was Nassau County because the interchange project is located almost entirely within the borders of the Village, only the outer limits of the interchange project cross into neighboring municipalities,, and the widening project was entirely within the Village. Moreover, the Village had continually exhibited its paramount interest in the project and its concern over the use of its streets and neighborhoods to handle detoured traffic throughout the review process. If the regulation-drafters intended service upon the county to be sufficient notwithstanding such substantial interests, they could easily have provided for service of notice on the "county” rather than the flexible standard the regulations now contain. In view of this lack of particularity in the regulations and their incorporation of subjective considerations when determining who is to be served, the burden rested on DOT, as the party seeking to assert the statute as a defense, to establish that its decision was appropriate and provided notice more than four months before the proceeding was commenced (see, Matter of Castaways Motel v Schuyler, 24 NY2d 120, 126-127). On this record, we conclude the statutory period did not start running until petitioner was served.
Respondents contend further that when an agency makes a *74 decision of general import that does not directly determine the rights of individuals, the agency is not required to give notice to potentially interested persons; the limitations period begins when the agency’s decision is made public. In view of the explicit language for actual notice to political subdivisions, however, we conclude that the notice requirements of the regulations were not satisfied in petitioner’s case by publication.
Accordingly, the order of the Appellate Division ^should be affirmed, with costs.
Chief Judge Wachtler and Judges Kaye, Alexander, Ti-tone, Hancock, Jr., and Bellacos a concur.
Order affirmed, with costs.

 SEQRA provides that the Commissioner of the Department of Environmental Conservation shall adopt rules and regulations implementing the provisions of SEQRA (ECL 8-0113). The statute also permits other agencies, subject to its provisions, to adopt procedures necessary to implement the requirements of the statute, provided that such "procedures shall be no less protective of environmental values” than DEC regulations (ECL 8-0113 [3]). Pursuant to ECL 8-0113 (3) DOT promulgated its own SEQRA regulations, codified at 17 NYCRR part 15.