■ In the Matter of TROY SAND & GRAVEL COMPANY, INC., Appellant, v NEW YORK STATE DEPARTMENT OF TRANSPORTATION, Respondent. [704 NYS2d 734] —Graffeo, J. Appeal from a judgment of the Supreme Court (Keegan, J.), entered September 1, 1999 in Albany County, which dismissed petitioner's application, in a combined proceeding pursuant to CPLR article 78 and action for declaratory judgment, to review a determination of respondent denying petitioner's request for use of certain types of aggregate in its construction projects.

Due to the rapid deterioration of the decks of two bridges located in Columbia County in 1994, respondent conducted a study which concluded that the presence of phyllite, a metamorphic derivative of sedimentary rocks, in the gravel aggregate that is mixed with concrete had caused "popouts" and "scaling." The shale-like phyllite was found to have had a tendency to split along internal laminations, thereby causing premature deterioration of surfaces from repeated exposure to sodium chloride-based deicing agents and freezing and thawing cycles. Gravel containing phyllite apparently is found only in certain regions of the State, and no gravel containing phyl-

lite was used in concrete for respondent's projects prior to 1994. Hence, respondent had not earlier undertaken testing of the substance.

Petitioner produces coarse aggregate material for the production of portland cement and bituminous concrete used by contractors in the construction of highways and bridges in New York. Petitioner had previously been designated by respondent as an approved source for the provision of such material from its facility in the Town of Sand Lake, Rensselaer County (hereinafter referred to as source 1-29G).

As a result of the significant deterioration of the two aforementioned bridge decks after one winter, respondent investigated all approved aggregate gravel sources and determined that petitioner's source 1-29G, along with 12 other sources, contained an excessive amount of phyllite. Two types of phyllite were identified as a result of the testing of these sources from phyllite-prone regions. The first type was deemed durable and referred to as "sound," while phyllite which tended to split along laminations was denominated "deleterious." Based on an analysis of the phyllite from each of the 13 tested sources, five sources (including petitioner) were rejected by respondent due to deleterious phyllite content. Petitioner thereafter commenced a CPLR article 78 proceeding alleging, *inter alia*, that respondent's determination was arbitrary, capricious and lacked any rational basis. Petitioner appeals from Supreme Court's dismissal of its application.

It is axiomatic that our review of respondent's determination, as is relevant here, is limited to whether it was arbitrary and capricious (*see, Matter of Village of Westbury v Department of Transp.*, 75 NY2d 62). Here, the record demonstrates that respondent's determination was dependant on a thorough investigation of the effect of phyllite on concrete and cement. Respondent's engineering geologist conducted a study of all currently or previously approved aggregate sources and identified 13 sources that contained greater than 5% phyllite. Samples of the phyllite component derived from petitioner's aggregate material were found to be geologically similar to a sample from the deteriorating bridge decks. Employing a third source as a control, the test involved exposing the samples to repeated freezing and thawing in a 3% brine solution in order to simulate weathering conditions. The bridge sample displayed a 23% loss by weight while the control sample showed a loss of only 3%. Respondent also denoted that phyllite with a loss of greater than 20% was "deleterious" and petitioner's material exhibited a 53% loss. As a result of this course of testing, five

companies' gravel aggregate, including that of petitioner, were removed from the approved list in January 1995. Petitioner attempted to make adjustments to its coarse aggregate by installing new crusher processing technology intended to reduce the phyllite content of its material, but further analysis of the modified sample continued to reveal an unsatisfactory level of deleterious phyllites. Petitioner's source was again rejected for inclusion on the approved source list in April 1997.

The gravamen of petitioner's argument is that respondent's determination was arbitrary and capricious because petitioner's major competitor, Callanan Industries, Inc. (hereinafter CII), was allegedly treated dissimilarly with regard to approval of its aggregate. Petitioner asserts that the results of one of the tests, the freeze-thaw evaluation, revealed that CII's aggregate exhibited a loss of 22.5% while petitioner's samples showed 9.8% and 6.6% losses. Although an agency may not treat similarly situated parties in a disparate manner or arbitrarily adapt different standards (see, Matter of Sunrise Manor Nursing Home v Axelrod, 135 AD2d 293, 297-298; Matter Exxon Corp. v Board of Stds. & Appeals, 128 AD2d 289, 296, lv denied 70 NY2d 614), we do not find the results of the freeze-thaw test to be a sufficient basis for a finding of irrationality. Respondent's engineer noted that CII's crushed stone aggregate contained no phyllite, which was the scientifically determined component causing the distress in concrete and the factor underlying respondent's elimination of formerly approved aggregate sources. Respondent indicated that the freeze-thaw test was only one of a number of tests and, standing alone, would not necessarily determine the acceptability of aggregate containing phyllite. Notably, petitioner does not challenge the nature of the testing used to determine the durability of source aggregates. Finding that respondent's determination was rationally based and not arbitrary or capricious, we conclude that there was no error in Supreme Court's dismissal of the petition.

Cardona, P. J., Crew III, Carpinello and Mugglin, JJ., concur. Ordered that the judgment is affirmed, without costs.