OPINION OF THE COURT
Eugene M. Fahey, J.
In these combined CPLR article 78 proceedings, petitioner City of Buffalo (hereinafter Petitioner City), petitioner Buffalo Olmsted Parks Conservancy, Inc. (hereinafter Petitioner Olmsted), and petitioners Episcopal Church Home of Western New York, Episcopal Residential Health Care Facility, Inc. and Episcopal Community Housing, Inc. (hereinafter Petitioners Episcopal Home) all challenge certain actions of the respondent Buffalo and Fort Erie Public Bridge Authority (hereinafter Respondent PBA) in obtaining a permit from respondent New York State Department of Environmental Conservation (hereinafter Respondent DEC) and certain actions of Respondent DEC in issuing that permit and the Negative Declaration, all relating to the proposed construction of a new bridge at the Peace Bridge crossing between Fort Erie, Ontario, and Buffalo, New York.
Petitioners collectively seek a declaration that, as a matter of law, Respondents have failed to comply with the procedural and substantive requirements of ECL article 8, commonly known as the State Environmental Quality Review Act (SEQRA), and directing Respondents to prepare an environmental impact statement (EIS). Petitioners also seek permanent injunctive relief barring Respondents from proceeding with bridge construction until they comply with the requirements under SEQRA and annulling the issuance of the permit.
The court’s role in reviewing these questions is limited to deciding if Respondent DEC’s determination was lawful or unlawful. It is not within the court’s powers to weigh desirability or choose among alternatives but only to insure that the substantive and procedural requirements of SEQRA are satisfied.
The petitions are granted. The failure by Respondent DEC to consider the cumulative impact of bridge and plaza construe *245 tion constituted a violation of the Department’s obligation to take “a hard look” under SEQRA. Therefore, the determination of nonsignificance was arbitrary and capricious. The issuance of the permit by Respondent DEC is annulled. The Negative Declaration of Respondent DEC is annulled. The Respondent PBA is permanently enjoined from going forward with bridge construction until it has complied with SEQRA. The matter is remitted to Respondents PBA and DEC for reconsideration of the cumulative impact of the proposed bridge construction and the related plaza/connected roadways project, and consideration of alternatives, and for preparation of an environmental impact statement concerning the same.
Oral argument was heard on this matter on August 12 and 13, 1999. The court has also carefully reviewed a record of over 7,000 pages of pleadings, exhibits and legal arguments.
This court, on October 14, 1999, dismissed a companion action brought by the PBA against the City. In that action, the PBA argued that the City must turn over easements, necessary for bridge construction, because of actions taken by the Common Council and members of the City administration. The article 78 action sought a grant and execution of a permanent bridge easement. The petition was denied and dismissed. On the same date, the court issued an interim decision concerning objections made by Respondent PBA concerning the standing of the Petitioners and the lack of proper verification of Petitioner City’s petition relating to this action. Those objections were dismissed.
We now address the heart of the legal dispute before this court: whether Respondents PBA and DEC complied with the requirements of SEQRA and its administrative regulations found at 6 NYCRR part 617.
Historic and Procedural Background
In 1933, the New York State Legislature enacted and the Governor approved the creation of Respondent Buffalo and Fort Erie Public Bridge Authority, in conjunction with the Dominion of Canada, and granted it powers to initially acquire, and subsequently maintain and operate the then privately owned Buffalo and Fort Erie Public Bridge Company (Company). The Company owned and operated the Peace Bridge, constructed in 1927 as the principal road link between western New York and Canada.
Recently, as traffic increased over the bridge, major congestion delays have made it apparent to responsive governmental *246 agencies and informed public opinion in the United States and Canada that some method of dramatically increasing traffic flow between Fort Erie and Buffalo was required.
In this regard, Respondent PBA began the Peace Bridge Capacity Expansion Project in the early 1990’s, the inter-linked Bridge Capacity Expansion Project, the Commercial Vehicle Processing Center Project in Canada, the Canadian Plaza/ Gateway Project and the U.S. Plaza/Connecting Roadways Project with the “overall cumulative * * * goal * * * to minimize delays experienced by vehicle traffic moving through Peace Bridge Facilities” (see, Respondent PBA Peace Bridge Capacity Expansion Final Environmental Assessment, comment 89, at 95, exhibit 27 of Respondent PBA Return, at 2440).
In March 1996, Respondent DEC agreed to assume the lead agency role for the bridge expansion project in conformity with 6 NYCRR 617.6.
On December 22, 1998, Respondent DEC concluded its review of the bridge expansion project by determining it would have no significant adverse impact upon the environment — the “negative declaration” of 6 NYCRR 617.2 (y).
On January 27, 1999, Respondent DEC issued the Federal Clean Water Act of 1977 (33 USC § 401, added by Pub L 95-217, 91 US Stat 1566) water quality certification for the bridge construction project. Petitioner then brought these article 78 proceedings.
The Negative Declaration
This court has closely examined the Negative Declaration issued by Respondent DEC. The document is pivotal to any determination that Respondents have properly complied with SEQRA.
The Negative Declaration first described the action — the proposed construction of a second international bridge, similar in appearance and construction to the existing Peace Bridge, and south of it, and connecting to the existing Canadian and United States toll plazas. As to its SEQRA status, it concluded: “Type I Action. Applicable threshold: the proposed bridge is substantially contiguous to a historical structure (the existing Peace Bridge, completed in 1927, which is eligible for listing on the National Register of Historic Places) and adjacent to an historical site (Front Park is listed on the National Register of Historic Places).”
The Negative Declaration then summarized the Federal (United States and Canada) Environmental Review Process *247 under the Draft Environmental Assessment — the DEA — which was drafted in September 1996. The DEA satisfied the requirements of the United States National Environmental Policy Act (NEPA) and the Canadian Environmental Assessment Act. Under those acts, the respective Coast Guards for the two countries assumed the Federal lead agency roles.
The Negative Declaration then reviewed the various bridge alternatives considered in the DEA and the conclusions contained in the Final Environmental Assessment, published in February 1997, which decided upon the “Similar Bridge/ Twin Span” alternative.
The Negative Declaration next addressed the question of New York State environmental review, first noting that the DEC Region 9 Division of Environmental Permits (DEP) had been actively involved in the many bridge studies conducted since 1991. It further noted Respondent DEC’s assumption of the SEQRA lead agency role and went on to state:
“SEQRA Segmentation: Initially and throughout review of this proposed bridge project, the DEC has seriously considered whether the' second Bridge proposal would be improperly segmented from the review of any possible future and related inland development (improvement to the Peace Bridge Plaza in the City of Buffalo) and concluded that: there is no common reason why the proposed Second Bridge and any plaza development that might be proposed must be constructed/completed at the same time; the Second Bridge does not cause future plaza development and/or City of Buffalo development and, therefore, does not contribute toward any significant cumulative or synergistic impacts; the proposed second Bridge does not obviate the need for future environmental review of any possible future development of the plaza and related highway improvements; the bridge proposal is functionally independent from any possible future inland plaza/highway improvements; construction of the bridge, as proposed, does not commit the project sponsor to undertake any other future development projects or DEC to approve any future regulated activities for those projects. The DEC, therefore, concludes that no improper segmentation has occurred; information on future project(s) is too speculative; a future project(s) may not occur; and a future project(s) is/are functionally independent of the proposed bridge project. Therefore, any future review conducted at the local and state levels will not be compromised, nor will approvals related to the present bridge proposal or future plaza/highway improvement proposal be less protective of the environment.
*248 “The USCG and the DEC are in agreement that no improper segmentation exists, since the proposed bridge ‘stands alone’ from, and can be built without commitment to, construction of Peace Bridge Plaza improvements. It should be noted that plaza improvements, if funded and approved, may not be constructed for five more years.” (Exhibit 95, Respondent PBA Return, at 6436-6437.)
The Declaration then closed by examining some 15 environmental factors over the next five pages — surface water-related impacts, land use and soil impacts, air quality, archeological and historic resources, visual and aesthetics, impact in energy, noise, transportation and navigation, neighborhood character, aquatic habitat, birds, endangered species and coastal consistency.
The Negative Declaration devoted two sentences to the question of possible adverse effects from traffic levels as relating to noise: “7. Noise: The proposed bridge will be constructed on the opposite, south/upstream side of the existing bridge from the Busti Avenue neighborhood and will not introduce bridge traffic noise any closer to the existing residences. Noise impacts from construction and operation of the Second Bridge should not exceed that of automobile and truck traffic currently using the existing Peace Bridge and the New York State Thruway (NYS Route 190), trains on the Conrail railroad or motorboats on the Niagara River.”
The Declaration also paid the matter some attention in the paragraph concerning neighborhood impact: “11. Impact on Character of Neighborhood/Area Community: The proposed bridge will be constructed on the south/upstream side of the existing Peace Bridge; therefore, that bridge will be between the Second Bridge and the Busti Avenue neighborhood. The Second Bridge will not result in changes to the local neighborhood. No pedestrian/bicycle pathways, neighborhood sections or community facilities would be isolated, separated or displaced as a result of construction or operation of the Second Bridge. Existing travel patterns on the Peace Bridge and in the community surrounding the U.S. Plaza are not expected to change from construction of the Second Bridge. Local residences and businesses will experience less local street congestion and potentially less long term associated noise and pollution.”
Consistent with its opinion that it was not required, the Negative Declaration did not address the bridge and bridge construction relating to traffic flow into (1) the current plaza, (2) construction of a new plaza in the current location, or (3) *249 construction of a new plaza in a new location. Traffic flow for the purpose of the review ends a few feet east of the proposed bridge.
The Declaration then concluded that the project had no adverse environmental effect.
Conclusions of Law
ECL 8-0109 (2) reads “All agencies * * * shall prepare * * * an environmental impact statement on any action they propose or approve which may have a significant effect on the environment.”
6 NYCRR 617.4 (a) (1) reads, in pertinent part, “the fact that an action or project has been listed as a Type I action carries with it the presumption that it is likely to have a significant adverse impact in the environment and may require an EIS.”
The substantive mandate of SEQRA is much broader than that of NEPA. 42 USCA § 4332 (2) (C) requires Federal agencies to prepare an EIS for any “major Federal actions significantly affecting the quality of the human environment.” This should be contrasted with ECL 8-0109 which is more expansive in its terms. Subdivision (2) of this section requires an EIS for “any action [which is] propose [d] or approve [d] which may have a significant effect on the environment.” Only a “low threshold” is required to trigger SEQRA review. (Onondaga Landfill Sys. v Flacke, 81 AD2d 1022 [4th Dept 1981].)
A number of aspects of the Negative Declaration trouble the court. Respondent DEC determines that the bridge project is a Type I project on the simple basis of its proximity to an historic structure — the existing Peace Bridge — and an historic site— Front Park. These elements fall under 6 NYCRR 617.4 (b) (9).
Respondent DEC then appears to address and presumably rebut the burden of a Type I classification — the likelihood of significant adverse environmental effect and the requirement for an environmental impact statement. Respondent DEC does so by noting in factor four that (1) bridge construction would have minor impact on the Peace Bridge by removing a portion of the 1953 widening project, and (2) bridge construction would not significantly impact Front Park because Front Park is outside the limits of construction.
Left hanging under this analysis are two other factors which also appear to qualify the bridge project as a Type I project under 6 NYCRR 617.4 (b) (6) and (7). First is the total acreage of the project area — 20.72 acres — and, second, the height of the prepared structure — 160 feet.
*250 These facts point to a basic difficulty. The proposed project is the largest construction project in recent western New York history. In terms of total dollars, it may be the most expensive ever. Can the court accept that a project of this magnitude will not have a significant environmental impact?
Nevertheless, there is an even more fundamental flaw, one fatal to the adequacy of the Negative Declaration. It is the question of the separation of the environmental review of the construction of the bridge from the plaza, commonly referred to as “segmentation.”
Segmentation
“[Segmentation, which is the dividing for environmental review of an action in such a way that the various segments are addressed as though they were independent and unrelated activities, is contrary to the intent of SEQRA and is disfavored * * *
“[T]he reasons for disfavoring segmentation are twofold. First is the danger that in considering related actions separately, a decision involving review of an earlier action may be ‘practically determinative’ of a subsequent action * * * The second danger occurs when a project that would have a significant effect on the environment is broken up into two or more component parts that, individually, would not have as significant an environmental impact as the entire project or, indeed, where one or more aspects of the project might fall below the threshold requiring any review.” (Matter of Concerned Citizens for the Envt. v Zagata, 243 AD2d 20, 22 [3d Dept 1998]; see also, Tri-County Taxpayers Assn. v Town Bd., 55 NY2d 41 [1982].)
Segmentation is an aspect of a broader regulatory imperative. The regulations require an EIS where an action is part of a long-term plan that includes other related actions with significant environmental impact.
“For the purpose of determining whether an action may cause [significant adverse environmental impact] the lead agency must consider reasonably related long-term, short-term, direct, indirect and cumulative impacts, including other simultaneous or subsequent actions which are:.
“(i) included in any long-term plan of which the action under consideration is a part;
“(ii) likely to be undertaken as a result thereof, or
“(iii) dependent thereon” (6 NYCRR 617.7 [c] [2]).
*251 Failure to consider cumulative impact led to the invalidation of an EIS in the landmark decision Matter of Save the Pine Bush v City of Albany (70 NY2d 193 [1987]). There, the EIS only dealt with an application to change the zoning of 29.9 undeveloped acres of pine barrens without reference to the cumulative impact of 10 similar proposals involving 295 acres. This unique area was the only remaining pine barrens on island sand dunes in the United States. The Court of Appeals held that the City of Albany must weigh in its EIS the cumulative impact of all pending zoning-change applications in the Pine Bush area, since they were all interrelated.
After Save the Pine Bush (supra), the Court of Appeals went on to hold that an agency’s issuance of a negative declaration which failed to consider cumulative impact mandated the preparation of an EIS.
That decision, Matter of Village of Westbury v Department of Transp. (75 NY2d 62 [1989]), found that a project involving widening of a State parkway was complementary to a separate interchange reconstruction project. Therefore, the combined effects of the two projects should have been considered in the DOT environmental review, the Court found, even though the two projects were not part of a single formalized plan. The Court concluded that the two projects shared a common purpose, shared an integrated schedule for consecutive construction, and that the design of each was dependent on the other. “[T]he interchange project had no independent utility without the subsequent widening of the * * * [p]arkway to the east. That being so, the regulations require the consideration of their combined effects” (Matter of Village of Westbury v Department of Transp., supra, at 69).
The Court also rejected DOT’S efforts to claim the interchange construction was undertaken with a separate distinguishable purpose: “it appears that the purpose for the improvements was more broadly related to traffic congestion” (Matter of Village of Westbury v Department of Transp., supra, at 69).
The Court also noted DOT’s Informational Bulletins responding to the public which linked the projects and other reports “identifying] the interchange and widening as ‘complementary]’ projects designed to improve the over-all traffic flow on the * * * [pjarkway” (Matter of Village of Westbury v Department of Transp., supra, at 70).
The Court concluded “[DOT] may not avoid consideration of their combined environmental effects simply by moving the limit line of the construction further west” (Matter of Village of Westbury v Department of Transp., supra, at 71).
*252 Given the strong parallels between Westbury (supra) and the bridge project, it should be no surprise that the record reveals a number of instances where members of, the public or public agencies raised the point that Respondent PBA was improperly segmenting the project.
Particularly noteworthy is the reaction of the New York State Thruway Authority.
By letter dated November 14, 1996 regarding the PBA Draft Environmental Assessment, the Thruway Authority concluded that cumulative effects of the bridge and plaza projects had not been addressed and that the United States Plaza might actually control bridge capacity.
The reaction of Respondent PBA to these concerns is contained in the McCormick Rankin Memorandum of December 16, 1996 that future capacity requirements would be addressed in the plaza study that was being carried on at the same time. The New York State Thruway Authority then responded by letter dated January 3, 1997, indicating its need for additional explanation of how that addressed the problem of queuing at the toll plaza generating congestion. McCormick Rankin then produced another Memorandum dated January 7, 1997, which conceded that the over-all level of service would be reduced to a certain degree. This produced yet another letter from the Thruway Authority dated January 10, 1997, thanking the PBA for meeting with the Thruway Authority in regard to the PBA’s efforts to respectively study the bridge crossing, the plaza improvements and the connecting highways and requesting further information about traffic flow. The record does not show a PBA reply.
In determining whether an action may have a significant effect on the environment, “the agency must * * * consider reasonably related effects ‘including other simultaneous or subsequent actions which are: (1) included in any long-range plan of which the action under consideration is a part; (2) likely to be undertaken as a result thereof; or (3) dependent thereon’ ” (Matter of Village of Westbury v Department of Transp., 75 NY2d 62, 68 [1989], supra, quoting Respondent DEC’s regulations at 6 NYCRR 617.7 [c] [2]).
Respondents have strained mightily to avoid the commonsense conclusion that the bridge project and the plaza project are so interrelated that a consideration, and more particularly, an environmental impact statement, of their cumulative impacts is needed. They misstate SEQRA’s requirement. The bridge and the plaza need not be constructed at the same time; *253 they can be built in sequence. Rather, their environmental effects are so interlinked that the projects must be considered at the same time. The second project here is no more “speculative” than the second project in Westbury (supra).
Respondent PBA has argued in its Memorandum of Law (at 43-47) that the projects are not part of a common long-term plan, that the plaza project started in October 1991 and that a “plan to investigate expansion of bridge capacity was first proposed in 1995.”
But this claim is belied by the record showing Respondent DEC’s Region 9 DEP being “actively involved with many of the U.S./Canadian International Bridge studies conducted since 1991.” (Negative Declaration, at R6436.) Studies of the two projects then are not separated by time, and are part of a common long-term plan.
If the two projects are not “complementary components of the remedy for the [project’s] traffic flow problems, sharing a common purpose, integrated and scheduled for consecutive construction * * * each * * * dependent on the other” (Matter of Village of Westbury v Department of Transp., supra, at 69), then Respondent PBA’s own Final Environmental Assessment (Return, at 2440) should not address the projects in precisely those terms, as stated below:
“The overall cumulative impact or goal of the Peace Bridge Projects, the Bridge Capacity Expansion project, the Commercial Vehicle Processing Center Project in Canada, the Canadian Plaza/Gateway Project and U.S. Plaza/Connecting Roadways Project, will be to minimize delays experienced by vehicle traffic moving through Peace Bridge Facilities. Specific impacts which were identified and studied in the DEA that could have a combined impact (from all Peace Bridge Projects) on the surrounding area, are as follows: Traffic, Noise, Air Quality, Visual Impacts, and Construction Impacts, and Front Park * * *
“Collectively, the Peace Bridge projects are attempting to satisfy the need for increased capacity which was identified by the previously mentioned studies. The individual facilities being developed by the respective Peace Bridge projects are being designed to handle the projected growth in traffic volumes * * *
“The individual Peace Bridge projects are being designed to different criteria, but to achieve the same goal: to minimize delays experienced by vehicle traffic moving through Peace Bridge Facilities.”
*254 The argument that the goals of the two projects are different, because one goal is to relieve traffic congestion, while the other is to increase traffic capacity, is a distinction without a difference. It is directly contradicted by the above analysis.
Likewise, the various arguments that separate reviews are appropriate, because the plaza project is overly speculative, or may not occur, are equally irrational. Traffic flow over the proposed bridge, as any local user of the current bridge knows, is acutely dependent on traffic flow through the current or any proposed new plaza. The court accepts that Respondent PBA intends to construct a new plaza. But, if in a worst case, Respondent PBA seriously intended to build a second bridge with no"change in the current plaza, the possibility of increased traffic congestion could not be discounted, and would never have been subject to any environmental review, all in violation of basic SEQRA requirements, as the New York State Thruway Authority noted back in 1996.
Indeed, this analysis upholds the central point of the Westbury decision (supra). Certain projects are so interlinked, so dependent upon each other, that they must be considered together.
Subsequent case law has expanded and refined the Westbury analysis. Most notably the Third Department in Matter of Stewart Park & Reserve Coalition v New York State Dept. of Transp. (157 AD2d 1), in discussing mandatory groupings of multiple actions for environmental consideration, set criteria for analysis of the cumulative effects of related projects. “First, where there is really but one plan for the development of a single area of special environmental significance, the accurate ecological/social/economic balancing of costs and benefits mandated under SEQRA requires that the cumulative effects of all actions within the plan for that area be weighed (see, Matter of Save the Pine Bush v City of Albany, 70 NY2d 193, 206). The second reason is that grouping the effects of related sequential actions avoids distortions in the balancing process if they were considered in separate succession when the decision in the earlier action may be ‘practically determinative’ of the subsequent action (Matter of Tri-County Taxpayers Assn. v Town Bd., 55 NY2d 41, 46; see, Matter of Kirk-Astor Dr. Neighborhood Assn. v Town Bd., 106 AD2d 868, 869, appeal dismissed 66 NY2d 896). Lastly, considering the cumulative effects of related actions insures against stratagems to avoid the required environmental review by breaking up a proposed development into component parts which, individually, do not *255 have sufficient environmental significance (Matter of Sutton v Board of Trustees, 122 AD2d 506, 508-509).” (Matter of Stewart Park & Reserve Coalition v New York State Dept. of Transp., supra, at 10.)
The facts in the instant case clearly show that there is really only one plan to relieve traffic congestion and that plan includes a new bridge and a new plaza. Further, if the bridge action is taken first, and separately, it is determinative of plaza location with all of its environmental consequences. Finally considering the cumulative effects of the bridge and plaza together will insure against “strategems to avoid the required environmental review.” (Matter of Stewart Park & Reserve Coalition v New York State Dept. of Transp., supra, at 10.)
The court also notes two recent decisions distinguishing Westbury (supra), Matter of Concerned Citizens for the Envt. v Zagata (243 AD2d 20 [3d Dept 1998], supra) and Matter of Iroquois Cent. School Dist. v Zagata (241 AD2d 945 [4th Dept 1997]).
In Concerned Citizens (supra), the Court required an EIS for the proposed action, a waste transfer station, but did not require review of the cumulative effects of a neighboring proposed materials recovery facility and incinerator, because it found the transfer station wholly independent of the other facilities, which would be subject to full SEQRA review later.
Iroquois Cent. (supra) involved the separate proposals to mine parcels of land in separate townships.
Neither decision there approaches the potential for interrelated impact of traffic flow found in the bridge/plaza proposals.
In this instant case, in terms of traffic flow, the bridge and the adjoining plaza with the connecting roadways are a single, inseparable development entity. The effects of their construction must be reviewed together. A final environmental impact statement considering the potential environmental effects of the proposed bridge, proposed plaza and alternatives is required.
The petitions are granted. The failure by Respondent DEC to consider the cumulative impact of bridge and plaza construction constituted a violation of the Department’s obligation to take “a hard look” under SEQRA. Therefore, the determination of nonsignificance was arbitrary and capricious. The issuance of the permit by Respondent DEC is annulled. The Negative Declaration of Respondent DEC is annulled. The Respondent PBA is permanently enjoined from going forward with bridge *256 construction until it has complied with SEQRA. The matter is remitted to Respondents PBA and DEC for reconsideration of the cumulative impact of the proposed bridge construction and the related plaza/connected roadways project, and consideration of alternatives, and for preparation of an environmental impact statement concerning the same.