352 F.3d 545
 STEWART PARK AND RESERVE COALITION, INCORPORATED (SPARC), Orange County Federation of Sportsmen's Clubs, Inc., Sierra Club, Plaintiffs-Appellants,
v.
Rodney E. SLATER, as United States Secretary of Transportation, United States Department of Transportation, Kenneth R. Wykle, as Administrator of the Federal Highway Administration, Harold J. Brown, as New York Division Administrator of the Federal Highway Administration, Federal Highway Administration, Louis R. Tomson, as Chairman of the New York State Thruway Authority, New York State Thruway Authority, Joseph Boardman, as Commissioner of the New York State Department of Transportation, New York State Department of Transportation, Defendants-Appellees.
 Docket No. 02-6272.
 United States Court of Appeals, Second Circuit.
 Argued: April 29, 2003.
 Decided: December 12, 2003.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED JOHN W. CAFFRY, ESQ., Glens Falls, NY, for Plaintiffs-Appellants.
 JAMES C. WOODS, Assistant United States Attorney for the Northern District of New York, Albany, N.Y. (Glenn T. Suddaby, United States Attorney for the Northern District of New York, Kenneth Dymond, Assistant Regional Counsel, Federal Highway Administration, on the brief), for Defendants-Appellees Rodney E. Slater, United States Department of Transportation, Kenneth R. Wylke, and Federal Highway Administration.
 LISA M. BURIANEK, Assistant Attorney General of the State of New York, Albany, N.Y. (Eliot Spitzer, Attorney General of the State of New York, Marion R. Buchbinder, Assistant Solicitor General, Daniel Chepaitis, Assistant Solicitor General, on the brief), for Defendants-Appellees Louis R. Tomson, New York State Thruway Authority, Joseph H. Boardman, and New York State Department of Transportation.
 RICHARD B. GOLDEN, Burke, Miele & Golden, LLP, Goshen, NY, for Amicus Curiae Stewart Regional Alliance.
 Before: VAN GRAAFEILAND, MINER and POOLER, Circuit Judges.
 Judge VAN GRAAFEILAND dissents in part in a separate opinion.
 MINER, Circuit Judge:
 
 
 1
 Plaintiffs-appellants commenced the action giving rise to this appeal seeking a declaration that defendants-appellees had violated various federal and state environmental and transportation laws in approving a proposed project to construct an interchange connecting an interstate highway to an airport. On cross motions for summary judgment, the United States District Court for the Northern District of New York (Treece, M.J.)[1] dismissed the action upon a finding that defendants-appellees had complied with all relevant federal and state laws. See Stewart Park & Reserve Coalition, Inc. v. Slater, 225 F.Supp.2d 219 (N.D.N.Y.2002) ("SPARC I").
 
 
 2
 The principal question we must answer in this appeal is whether the publicly owned properties surrounding the airport, which for almost thirty years have been made available to the public for use as a park, are "parklands" subject to the protections of Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303(c), notwithstanding the fact they were never permanently designated as such. Defendants-appellees concluded that they were not and consequently failed to perform the required analysis set forth in Section 4(f) before approving the proposed construction of the interchange, which was to traverse these properties. Because we find that defendants-appellees' interpretation of Section 4(f) is not supported by the plain meaning or legislative history of the statute, we conclude that their interpretation of Section 4(f) is unreasonable and not entitled to deference and that they should have performed the analysis set forth in Section 4(f) before approving the proposed construction of the interchange. We therefore reverse the District Court's summary judgment to the extent that it dismissed plaintiffs-appellants' claim that defendants-appellees were required to perform the analysis set forth in Section 4(f), and remand the case to the District Court for proceedings consistent with this opinion. Additionally, for the reasons set forth below, we affirm the judgment of the District Court in all other respects.
 
 BACKGROUND
 
 3
 The undisputed facts giving rise to this appeal are set forth in the District Court's comprehensive published opinion, see SPARC 1, 225 F.Supp.2d 219, familiarity with which is assumed. We therefore summarize below only those facts and proceedings relevant to the present appeal.
 
 
 4
 I. Development History of Stewart International Airport and the Surrounding Area
 
 
 5
 In 1969, the United States transferred ownership of the Stewart Air Force Base (consisting of 1552 acres) to the Metropolitan Transportation Authority ("MTA"). The MTA acquired the property with the intention to create Stewart International Airport as a fourth major airport to service the New York City metropolitan area. To that end, the property adjacent to the airbase was identified as necessary for transportation purposes, including airport access and expansion, as well as compliance with Federal Aviation Administration ("FAA") requirements. In 1971, the New York State Legislature authorized defendant-appellee New York State Department of Transportation ("NYSDOT") to acquire 8675 acres of land adjacent to, and in the vicinity of, the airbase for airport expansion purposes ("Stewart Buffer Lands") on behalf of the MTA.
 
 
 6
 In 1974, MTA and the New York State Department of Environmental Conservation ("NYSDEC") executed a revocable management agreement pursuant to which NYSDEC would manage about 7000 acres of the Stewart Buffer Lands on behalf of MTA. The agreement, which was terminable upon sixty days' notice, permitted interim use of the Stewart Buffer Lands for hunting, fishing, hiking, and other outdoor activities. This area became known as the Stewart Airport Cooperative Hunting Area. In 1982, jurisdiction over Stewart International Airport, including the Stewart Buffer Lands and the Crestview Lake property (which was located on the original airport property), was transferred from MTA to NYSDOT, which chose to continue management of the property through NYSDEC. In 1982, the Town of New Windsor entered into a revocable license agreement with NYSDOT that allowed the Town to operate the Crestview Lake property as the Charles Martin Recreation Facility pending airport expansion. Since then, the Town and its residents have used this facility for swimming, picnicking, tennis, boating, and fishing. The formal license expired in April 2002.
 
 
 7
 For almost thirty years, the Stewart Buffer Lands have been heavily used for hunting, fishing, hiking, biking, birdwatching, horseback riding, and numerous other outdoor pursuits. Hunting alone results in several thousand visits per year. Indeed, NYSDEC adopted regulations for the use of these lands entitled "Public Use in the Stewart Airport Cooperator Area," see N.Y. Comp.Codes R. & Regs. tit. 6, pt. 92, and issued annual reports on usage levels.
 
 II. The Interchange Construction Project
 
 8
 In 1991, the New York State Legislature directed defendant-appellee New York State Thruway Authority ("NYSTA") to acquire Interstate Highway 84 ("I-84"). The Legislature transferred ownership of the New York portion of I-84 from the State and NYSDOT to NYSTA, effective March 19, 1992. In 1992, the Legislature directed NYSTA to undertake a project to provide direct access to Stewart International Airport from I-84 to relieve traffic congestion to and from the airport on local roads.[2] Accordingly, in 1992, NYSDOT proposed a series of three new I-84 interchanges at Drury Lane, Barron Road, and Ridge Road, with development nodes along each corridor. During that same year, NYSDOT and defendant-appellee United States Department of Transportation ("DOT") issued a final Environmental Impact Statement ("EIS") analyzing these and other proposals for the development of Stewart International Airport.
 
 
 9
 During the comment period on the 1992 EIS, the United States Department of the Interior ("DOI") submitted comments in which it indicated that it did "not entirely agree" with a determination made by FAA that the Stewart Buffer Lands were not subject to Section 4(f) protection because the use of the properties as a hunting cooperative was "permitted under an agreement that recognize[d] such use as an interim use which [could] be terminated upon 60 days['] notice." According to DOI, "[f]or all practical purposes, the [properties were] now a significant publicly-owned recreation and wildlife management area, and they [were] likely, in part at least, to remain so in the future." DOT's response to DOI's comments in the 1992 final EIS disagreed with DOI's conclusion that the Stewart Buffer Lands were subject to Section 4(f) protection. In particular, the 1992 EIS cited to a provision in FAA's Airport Environmental Handbook, which "clearly state[d] that where property is owned by and currently designated for use by a transportation agency and a park or recreation use of the land is being made only on an interim basis, a Section 4(f) determination is not required." Thus, "[t]he fact that the agreement between NYSDOT and NYSDEC was intended to and [did] set up an interim use and that the land covered by the agreement was acquired for transportation purposes and continue[d] to be held for transportation purposes, clearly indicate[d] that the [Stewart Buffer Lands were] not subject to protection under Section 4(f)."
 
 
 10
 The proposed development projects were never implemented, however, due to intervening events, including: (i) the privatization of Stewart International Airport; and (ii) the permanent transfer of 5264 acres of the Stewart Buffer Lands from NYSDOT to NYSDEC jurisdiction for restoration purposes (which included "recreation and kindred purposes," see N.Y. Envtl. Conserv. Law § 9-0501(1)). Consequently, the 1992 EIS became obsolete. Because of these changed circumstances, in the mid-1990s, NYSTA and NYSDOT (collectively, "State Defendants"), together with DOT and the Federal Highway Administration ("FHA") (collectively, "Federal Defendants"), prepared new plans for improved access to Stewart International Airport. In December 1997, Defendants published a Notice of Intent to prepare an EIS relating to the improvement project in the Federal Register. See 62 Fed.Reg. 66,713 (Dec. 19, 1997). In April 1999, a draft EIS was released, and a duly noticed public hearing on that draft EIS was held the following May, with comments due by June 1, 1999.
 
 
 11
 After comments were received, Defendants made revisions to the draft EIS. In deciding which preferred design to select, the EIS analyzed five alternatives in response to the traffic congestion problems at the airport. These included: (1) a "no build alternative"; (2) a plan to decrease demand for use of the roads; (3) upgrades to local roadways; (4) construction of a new access road from local roadways; and (5) construction of a new access route from interstate roadways. The EIS assessed, among other things, the degree to which each alternative would improve access to the airport, the efficacy of each alternative in relieving congestion on local roadways, its likely contribution to the local economy, its environmental impacts, and its costs. The review included extensive traffic studies and modeling analysis of growth inducement, and analyzed significant environmental impacts, including impacts on air quality, noise pollution, wetlands, and wildlife.
 
 
 12
 Although DOI did not raise any concerns relating to Section 4(f) in its comments on the 1999 draft EIS, FHA addressed the subject in a 1997 memorandum to NYSDOT concerning the Crestview Lake property. In that memorandum, FHA indicated that, since the Crestview Lake property was currently being "used for recreational purposes," FHA "review was necessary to determine whether the property was `protected' by Section 4(f)." FHA then shared its conclusion that "the actual property interest and ownership [was] `transportation related' and therefore, Section 4(f) [did] not apply." This conclusion was consistent with the conclusion reached by NYSDOT in a letter written to FHA a month earlier.[3]
 
 
 13
 In April 2000, Defendants released a final EIS, which selected a preferred project design. The preferred design, which affects more than 1200 acres of the Stewart Buffer Lands, will provide airport traffic with direct access from I-84 over four-lane highways that are better able to accommodate modern commercial and passenger traffic than existing local roads.[4] The EIS explicitly identified the environmental impacts from this plan and compared them with the impacts from the other alternatives. The EIS acknowledged that any expansion of access to the airport would have environmental impacts but noted mitigation measures that had been incorporated into the plan. In June 2002, the Federal Defendants issued a Record of Decision ("ROD") documenting their decision to select the preferred project design. The State Defendants issued their ROD in June of 2000 (N.Y.SDOT) and February of 2001 (N.Y.STA).
 
 III. Proceedings in the District Court
 
 14
 In October 2000, plaintiffs-appellants Stewart Park and Reserve Coalition ("SPARC") and Orange County Federation of Sportsmen's Clubs, Inc. commenced this action for declaratory and injunctive relief with the filing of an eight-count complaint. An amended complaint was filed eleven days later adding the Sierra Club as a plaintiff. Plaintiffs are a coalition of organizations and individuals representing over one million members who are sportsmen, bicyclists, hikers, bikers, birders, horseback riders, and others who use the Stewart Buffer Lands. Count One of the Amended Complaint alleged that Defendants violated Section 4(f) by failing to designate the Stewart Buffer Lands as parklands protected by Section 4(f) and then selecting a design proposal without complying with the procedural requirements of the statute.
 
 
 15
 Count Two alleged that the Federal Defendants violated the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C) ("NEPA"), and its implementing regulations by approving an EIS that "use[d] data and analysis of traffic, including truck traffic, that [were] arbitrary and without support in the record." As a result, Plaintiffs alleged, the traffic and air quality impacts of the project were understated. Count Three alleged that the same conduct on the part of the State Defendants violated New York's State Environmental Quality Review Act, N.Y. Envtl. Conserv. Law art. 8 ("SEQRA"), and its implementing regulations.
 
 
 16
 Count Four alleged that the Federal Defendants further violated NEPA and its implementing regulations because the EIS failed to analyze the adverse environmental impacts of all connected and closely related actions, as well as the cumulative impacts of such actions. In particular, Plaintiffs alleged that the proposed project was "originally conceived as part of a single larger project to improve traffic conditions on I-84 and its connecting roads." "This larger project included an additional interchange between I-84 and I-87 ... [, located] about three miles east" of the proposed project. According to Plaintiffs, "when the EIS ... was prepared, analysis of the interchange between I-87 and I-84 was excluded." Count Five alleged that the same conduct on the part of the State Defendants violated SEQRA and its implementing regulations.
 
 
 17
 Count Eight alleged that the Defendants violated the Federal-Aid Highway Act, 23 U.S.C. § 111, which prohibits a state from adding any points of access to, or exit from, an interstate highway without the approval of DOT, which has delegated that approval authority to FHA. In particular, Plaintiffs alleged that, in the Interchange Justification Report ("IJR") for this project, Defendants failed to include proposed construction of additional interchanges at nearby I-87 and Barron Road, allegedly in violation of FHA policies.[5] Finally, the relief sought by Plaintiffs included (1) a declaration that the Defendants failed to comply with the state and federal laws referenced above; (2) a mandatory injunction requiring Defendants to comply with these federal and state laws; and (3) an injunction requiring the Defendants to revoke their approval of the project and the EIS and prohibiting any further development of the project.
 
 
 18
 In March 2001, Defendants moved for summary judgment, after which Plaintiffs moved for discovery pursuant to Fed. R.Civ.P. 56(f). Defendants then agreed to defer their summary judgment motions and to provide Plaintiffs, in lieu of discovery, with all the documents that were responsive to a Freedom of Information Act request that had previously been filed by Plaintiffs concerning the interchange construction project. After these documents were produced, Plaintiffs cross-moved for summary judgment.
 
 
 19
 In a published decision dated September 30, 2002, the District Court granted Defendants' summary judgment motion, denied Plaintiffs' summary judgment motion, and dismissed the action. SPARC I, 225 F.Supp.2d at 227-35. In a subsequent published opinion and order dated November 21, 2002, see 232 F.Supp.2d 1 (N.D.N.Y.2002) ("SPARC II"), the District Court granted Plaintiffs' motion for a stay and preliminary injunction pending appeal. Plaintiffs timely appealed from the District Court's judgment on the merits, while Defendants timely appealed from the District Court's order granting the stay and preliminary injunction. After subsequent motions practice before the District Court and this Court concerning the stay and the preliminary injunction, the parties agreed to expedite the appeal and continue the stay pending appeal. After oral argument, we entered an order continuing the District Court's stay and preliminary injunction pending our release of an opinion on the merits, and Defendants subsequently withdrew their cross appeals.
 
 DISCUSSION
 I. Section 4(f)
 A. Standard of Review
 
 20
 As an initial matter, we disagree with the standard of review applied by the District Court in concluding that the Federal Defendants were correct in determining that they did not have to perform the required analysis set forth in Section 4(f). According to the District Court, its review was "limited to determining whether the Secretary of Transportation's decision was wholly unreasonable or whether the Secretary failed to follow the necessary procedural requirements." SPARC I, 225 F.Supp.2d at 227. This is not a situation where the Federal Defendants agreed that they had to perform the analysis set forth in Section 4(f), they performed that analysis, and we are being asked to review whether that analysis was correct. In such a case, we would apply the arbitrary and capricious standard of review set forth in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). See, e.g., Nat'l Parks & Conservation Ass'n v. United States Dep't of Transp., 222 F.3d 677, 682 (9th Cir.2000).
 
 
 21
 Instead, this is a case where the Federal Defendants' decision that they did not have to perform the Section 4(f) analysis was based on their interpretation of the statute. That interpretation is entitled to judicial deference only if the interpretation was reasonable and if it was not "`at odds with the plain language of the statute itself.'" Leonard F. v. Isr. Discount Bank of N.Y., 199 F.3d 99, 106 (2d Cir.1999) (quoting Pub. Employees Ret. Sys. v. Betts, 492 U.S. 158, 171, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989)). Applying this standard of review, we conclude that the Federal Defendants' interpretation of Section 4(f) is not entitled to deference because it is not reasonable and is at odds with both the plain language and the legislative history of Section 4(f).
 
 B. Text of Section 4(f)
 
 22
 "In interpreting a statute we must first look to the language of the statute itself." Greenery Rehab. Group v. Hammon, 150 F.3d 226, 231 (2d Cir.1998). "If the statutory terms are unambiguous, our review generally ends and the statute is construed according to the plain meaning of its words." Id.
 
 
 23
 Section 4(f) permits the Secretary of Transportation to approve a transportation project that involves, inter alia, the "use... of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance ... (as determined by the Federal State or local officials having jurisdiction over the park, area, refuge, or site)," only if:
 
 
 24
 (1) "there is no prudent and feasible alternative to using that land"; and (2) "the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge or historic site resulting from [such] use."
 
 
 25
 49 U.S.C. § 303(c). Moreover, the statute also states that "[i]t is the policy of the United States Government that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refugees, and historic sites." Id. § 303(a).
 
 
 26
 The text of Section 4(f) contains no requirement that the public parklands to which it applies be permanently designated as such, and we decline judicially to engraft such a requirement on the statute, given the Congressional policy expressed in the statute that parklands be afforded heightened protection. If Congress wanted to include such a requirement in the statute, it could have done so. Accordingly, Section 4(f) should have been applied here, notwithstanding the facts that the Stewart Buffer Lands and the Crestview Lake property were originally acquired for transportation purposes and were never permanently designated as parklands.
 
 C. Legislative History
 
 27
 Because we find the text of Section 4(f) to be unambiguous, we need not rely on the statute's legislative history in determining whether the Federal Defendants' interpretation of the statute was reasonable. In any event, an examination of the relevant legislative history buttresses our interpretation of the statute. Section 4(f) was originally enacted in 1966 as Section 4(f) of the Department of Transportation Act, Pub.L. No. 89-670, 80 Stat. 934 (1966), which established the DOT and transferred to DOT certain other agencies and their functions. See H.R.Rep. No. 89-1701, at 3-4 (1966), reprinted in 1966 U.S.C.C.A.N. 3362, 3363-64. Section 4(f), however, was not related to any transferred functions but was a new provision added by Senate amendment. H.R. Conf. Rep. No. 89-2236, at 25 (1966), reprinted in 1966 U.S.C.C.A.N. 3448, 3450. According to the Senate report accompanying the amendment containing Section 4(f), the purpose of the provision was "to insure that in planning highways, railroad rights-of-way, airports, and other transportation facilities, care will be taken, to the maximum extent possible, not to interfere with or disturb established recreational facilities and refuges." S.Rep. No. 89-1659, at 6 (1966) (emphasis added).
 
 
 28
 Here it cannot be gainsaid that the Stewart Buffer Lands and the Crestview Lake property were established parklands. They have been used exclusively as parklands for almost thirty years since they were acquired pursuant to a series of management agreements. Adopted pursuant to N.Y. Envtl. Conserv. Law § 11-0501, the purposes of these agreements include the "preserv[ation] and develop[ment] [of] fish and wildlife resources of the state and improve[ment] [of] access to them for recreational purposes by the people of [New York]." Id. § 11-0501(1). Indeed, as noted above, in 1974, NYSDEC promulgated regulations for the use of these lands entitled "Public Use in the Stewart Airport Cooperator Area," and those regulations have been in place since then.
 
 D. FHA Regulations and Policy
 
 29
 The Federal Defendants' interpretation of Section 4(f) is also at odds with FHA's own regulations and policies. For example, the FHA regulations implementing Section 4(f) parrot the language of the statute and contain no requirement that the analysis in Section 4(f) need be applied only to parklands that are permanently designated as such. See 23 C.F.R. § 771.135(a). Moreover, an FHA Section 4(f) policy paper explains that:
 
 
 30
 Publicly owned land is considered to be a park, recreation area[ ], or wildlife and waterfowl refuge when the land has been officially designated as such or when the Federal, State, or local officials having jurisdiction over the land determine that one of its major purposes or functions is for park, recreation, or refuge purposes. [I]ncidental, secondary, occasional, or dispersed recreational activities do not constitute a major purpose.
 
 
 31
 Federal Highway Administration, Section 4(f) Policy Paper (revised June 7, 1989), available at http://environment.fhwa.dot.gov/projdev/4fpolicy.htm (emphasis added). And the FAA Airport Environmental Handbook, relied on in the 1992 EIS, states that "[w]here property is owned by and currently designated for use by a transportation agency and a park or recreation use of the land is being made only on an interim basis, a [S]ection 4(f) determination would not ordinarily be required." Federal Aviation Administration, Airport Environmental Handbook ch. 5 (Oct. 8, 1985), available at http:// www.faa.gov/arp/app600/5054a/chap5.htm (emphasis added).
 
 
 32
 Here, as discussed above, for almost thirty years, state and local governments have determined that the Stewart Buffer Lands and the Crestview Lake property were to be principally used as a park. This uninterrupted period of use cannot be characterized as interim. Accordingly, the Federal Defendants' interpretation of Section 4(f) is belied by their own regulations and internal policies.[6]
 
 
 33
 * * * * * *
 
 
 34
 For all the reasons discussed above, the Federal Defendants' interpretation that a Section 4(f) analysis is required only with respect to lands that are permanently designated and permanently used as parklands is unreasonable and not supported by the plain meaning of the statute. In finding otherwise, the District Court relied on two cases from district courts outside of this Circuit — Collin County, Texas v. Homeowners Ass'n for Values Essential to Neighborhoods, 716 F.Supp. 953 (N.D.Tex. 1989), vacated on other grounds, 915 F.2d 167 (5th Cir.1990), and Citizens Environmental Council v. Volpe, 364 F.Supp. 286 (D.Kan.), aff'd mem., 484 F.2d 870 (10th Cir.1973). See SPARC I, 225 F.Supp.2d at 229. Those cases are distinguishable from the case at bar, however. First, the properties in those cases were initially acquired for the purpose of highway construction. In contrast, the Stewart Buffer Lands were initially acquired to serve as a noise buffer for the airport. Second, the circumstances surrounding the uses of the properties in those cases were significantly different from the circumstances surrounding the uses of the Stewart Buffer Lands and the Crestview Lake property. See Collin County Tex., 716 F.Supp. at 971 n. 37 (the city approached the county about the possibility of using the latter's right-of-way land "as a `temporary park' until construction began"); Volpe, 364 F.Supp. at 295 (property was never used as a park). In any event, to the extent that these cases are inconsistent with our opinion in this case, we reject them. Finally, in holding that a Section 4(f) analysis is required here, we are not establishing a bright-line test with respect to how long a particular tract of property needs to be used as a park before such an analysis is required. We hold only that the uninterrupted and purposeful use by the public of the Stewart Buffer Lands and the Crestview Lake property for almost thirty years makes those lands a public park and recreation area of state and local significance within the meaning of Section 4(f).
 
 
 35
 Accordingly, on remand, the Defendants will have to determine whether (1) there are no prudent and feasible alternatives to using the Stewart Buffer Lands and the Crestview Lake property for the interchange project, and (2) whether the project includes all possible planning to minimize whatever harms will result to the Stewart Buffer Lands and the Crestview Lake property. See 49 U.S.C. § 303(c).
 
 II. Remaining Issues on Appeal
 
 36
 Plaintiffs' remaining arguments on appeal need not detain us long. Those arguments are that: (1) Defendants violated NEPA and SEQRA by (a) ignoring or manipulating relevant traffic data used in the EIS and (b) improperly segmenting the environmental review of the airport interchange construction protect with another proposed construction project with respect to an existing interchange connecting I-84 and I-87; and (2) the Federal Defendants violated the Federal-Aid Highway Act by failing to analyze the I-84/I-87 interchange project and a proposed interchange connecting I-84 and Barron road in the IJR prepared for this project. As we explain below, we find each of these arguments to be without merit largely for the reasons contained in the District Court's decision.
 
 A. NEPA and SEQRA
 
 37
 NEPA requires a federal agency to prepare an EIS before taking any major action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The purpose of an EIS is to "provide full and fair discussion of significant environmental impacts and [to] inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize the adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. NEPA is a procedural statute that mandates a process rather than a particular result. Sierra Club v. U.S. Army Corps of Eng'rs, 701 F.2d 1011, 1029 (2d Cir.1983). In other words, NEPA does not command an agency to favor any particular course of action, but rather requires the agency to withhold its decision to proceed with an action until it has taken a "hard look" at the environmental consequences. Id.
 
 
 38
 "The only role for a court is to insure that the agency has taken a `hard look' at environmental consequences; it cannot `interject itself within the area of discretion of the executive as to the choice of the action to be taken.'" Id. (quoting Kleppe v. Sierra Club, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)). Given the role of the EIS and the narrow scope of permissible judicial review, a court "may not rule an EIS inadequate if the agency has made an adequate compilation of relevant information, has analyzed it reasonably, has not ignored pertinent data, and has made disclosures to the public." Id. (footnote omitted) Thus:
 
 
 39
 [t]he district court does not sit as a super-agency empowered to substitute its scientific expertise or testimony presented to it de novo for the evidence received and considered by the agency which prepared the EIS. The court's task is merely to determine whether the EIS was compiled in objective good faith and whether the resulting statement would permit a decisionmaker to fully consider and balance the environmental factors. The court is not empowered to substitute its judgment for that of the agency. This is particularly true when it comes to evaluating the factual conclusions of the EIS. If the agency's conclusions have a substantial basis in fact and if the EIS has set forth responsible opposing scientific views it is not for the district court to resolve conflicting scientific options.
 
 
 40
 Id. (internal quotation marks and citations omitted).
 
 
 41
 Similarly, in reviewing an agency's SEQRA determination, a court's role is not to choose among alternatives or to substitute its judgment for that of the agency. Akpan v. Koch, 75 N.Y.2d 561, 570, 555 N.Y.S.2d 16, 554 N.E.2d 53 (1990). Rather, it is to review the record to determine if the agency "identified the relevant areas of environmental concern, took a `hard look' at them, and make a `reasoned elaboration' of the basis for its determination." Jackson v. N.Y. State Urban Dev. Corp., 67 N.Y.2d 400, 417, 503 N.Y.S.2d 298, 494 N.E.2d 429 (1986).
 
 1. Traffic Data Analysis in the EIS
 
 42
 Plaintiffs argue that Defendants failed to comply with NEPA and SEQRA by using improper or manipulated traffic data. In particular, Plaintiffs cite a traffic study from the Newburgh-Orange County Transportation Council (the "Council") purportedly showing a conflict between data contained in the EIS and the Council's data. The EIS estimated that ninety percent of the airport-bound traffic would use the new interchange and thus be diverted from local streets, alleviating congestion on those streets. Plaintiffs claim that the Council data estimated this percentage to be forty percent. Thus, Plaintiffs argue, the "90%/10% split was at best a guesstimate and is not supported by any technical analysis in the record" and that Defendants "whitewash[ed]" the Council data by ignoring it or improperly withholding it from the EIS.
 
 
 43
 Here, the record indicates that the traffic data used in the EIS was gathered through an extensive process using manual and automated traffic counts, traffic analysis, traffic flow mapping, and traffic modeling. The projections of traffic usage and data gathering were based on standard NYSDOT procedures and are used in all state projects. The traffic data and analysis are fully set forth in the EIS, and then summarized, reviewed, and analyzed in terms of alternatives, air quality impacts, and growth-inducing effects. Moreover, public comments were received — including comments from Plaintiffs' expert — and those comments were addressed. See SPARC I, 225 F.Supp.2d at 231.
 
 
 44
 The record also shows that the "ninety percent estimate" challenged by Plaintiffs was not picked out of thin air. Tables B-1 and B-2 of Appendix B to the EIS show that seventy-three percent of the airport traffic is from I-84 and I-87 and that eleven percent of local traffic originates west of the airport and would naturally use the new entrance on Drury Lane, totaling eighty-four percent of the airport traffic. Moreover, the response in the EIS to Plaintiffs' comments concerning the reasonableness of the EIS 90%/10% split is reasonable, i.e., other "forecasts were prepared with the understanding that the model cannot account for driver psychology and preconceived notions of congestion in the highway network, and it cannot account for the effects that signage [i.e., signs telling drivers about the new interchange] may have on route selection."
 
 
 45
 Furthermore, as the District Court also correctly concluded, Plaintiffs' reliance on passages from a memo by one of Defendants' consultants (indicating a need to respond to concerns that had been raised about the traffic data) was misplaced. As the District Court noted, Plaintiffs took one sentence from a four-page memo out of context. The comments contained in the memo represent the consultant's deliberative process in responding to public comments (primarily Plaintiffs' concerns), and demonstrate the consultant's attempts to address various issues relating to traffic data raised during the comment period and to present them in a comprehensive and understandable manner in the final EIS. See SPARC I, 225 F.Supp.2d at 231. Thus, the consultant addressed various development scenarios (including those raised by Plaintiffs during the comment period) and suggested a range of traffic projections dependent upon those scenarios. Id. Accordingly, the District Court was correct in concluding that "Plaintiffs' allegation that Defendants intentionally withheld the information is not supported by the record." Id. at 232.
 
 
 46
 Next, Plaintiffs' claims that Defendants relied on arbitrary and erroneous truck traffic numbers were properly rejected by the District Court based upon an error by Plaintiffs' expert, who used "percentage of trucks" and "number of trucks" interchangeably. As the District Court explained, a reduction in the percentage of trucks from four percent to two percent does not necessarily correspond to a fifty percent reduction in the number of trucks, especially if the number of trucks do not go up or down in proportion to the number of other vehicles. Id. at 232. Plaintiffs' claim of a flawed forecast decrease in percentage of trucks on Drury Lane ignores this significant distinction. Thus, truck numbers were actually predicted to increase if the interchange were built, because truck traffic will use the direct airport route from the interstate rather than local roads. But truck percentages were forecast to decrease due to the proportional increase in other types of vehicle traffic using the interchange. Accordingly, the District Court properly concluded that "Defendants' determination [that] the percentage of trucks will decrease was not erroneous or arbitrary." Id.
 
 2. Segmentation
 
 47
 Segmentation is an attempt to circumvent NEPA by breaking up one project into smaller projects and not studying the overall impacts of the single overall project. "Segmentation is to be avoided in order to insure that interrelated projects, the overall effect of which is environmentally significant, not be fractionalized into smaller, less significant actions." Town of Huntington v. Marsh, 859 F.2d 1134, 1142 (2d Cir.1988) (internal quotation marks omitted). A project is properly segmented if it (1) connects logical termini and is of sufficient length to address environmental matters of a broad scope; (2) has independent utility or independent significance; and (3) will not restrict consideration of alternatives for other reasonably foreseeable transportation improvements. 23 C.F.R. § 771.111(f) (FHA NEPA regulations); 40 C.F.R. § 1508.25(a) (CEQ regulations). A project has been improperly segmented, on the other hand, if the segmented project has no independent utility, no life of its own, or is simply illogical when viewed in isolation. Hudson River Sloop Clearwater, Inc. v. Dep't of Navy, 836 F.2d 760, 763-64 (2d Cir.1988); In re Village of Westbury v. Dep't of Transp., 75 N.Y.2d 62, 69, 550 N.Y.S.2d 604, 549 N.E.2d 1175 (1989).
 
 
 48
 Plaintiffs argue on appeal that the airport interchange project and another project involving reconstruction of an I-84/I-87 interchange were improperly segmented, i.e., analyzed separately. In support of this allegation, Plaintiffs point to a history of documents describing the two projects at various times as phases of a single project. For the reasons set forth below, the District Court properly rejected this argument.
 
 
 49
 The two construction projects have distinct and independent purposes. The airport project is designed to provide a direct link between I-84 and the airport. On the other hand, the I-84/I-87 project is designed to make an interstate interchange safer and more efficient by separating vehicles exiting from one interstate to another from vehicles seeking to travel local routes. Thus, each project would serve its respective purpose, regardless of whether the other is built. That the two projects were discussed together in the past is not dispositive, and the record shows that this joint consideration was primarily due to complex funding requirements.[7] As the District Court correctly concluded, "[t]he mere fact that the two projects are `interrelated as part of an overall transportation plan' does not mean that they do not `individually contribute to alleviation of the traffic problems ... and [were] therefore not improperly segmented as separate projects.'" SPARC I, 225 F.Supp.2d at 233 (quoting Utahns for Better Transp. v. U.S. Dep't of Transp., 305 F.3d 1152, 1184 (10th Cir.2002)).
 
 B. Federal-Aid Highway Act
 
 50
 The Federal-Aid Highway Act, 23 U.S.C. § 111, provides that a state may not add points of access to, or exit from, a federally funded interstate highway without the approval of the Secretary of Transportation. The Secretary has delegated that approval authority to the FHA Administrator. See 49 C.F.R. § 1.48(b)(10). The FHA has issued a formal policy statement addressing how it will review requests for approval of additional interchanges under § 111. See 63 Fed.Reg. 7045 (Feb. 11, 1998). The policy lists a number of requirements for new or revised access points to the existing interstate highway system, including two requirements that are relevant to this appeal:
 
 
 51
 (6) In areas where the potential exists for future multiple interchange additions, all requests for new or revised access [must be] supported by a comprehensive Interstate network study with recommendations that address all proposed and desired access within the context of a long-term plan.
 
 
 52
 (7) The request for a new or revised access generated by new or expanded development [must] demonstrate[ ] appropriate coordination between the development and related or otherwise required transportation system improvements.
 
 
 53
 Id. at 7046. Here, the IJR required for the airport project was not a separate document, as FHA determined that the EIS could also serve as that report and approved it as complying with § 111.
 
 
 54
 Plaintiffs argue on appeal that FHA violated § 111 by approving an interchange report that failed to consider other nearby interchanges at I-87/I-84 and at I-84 and Barron Road. The District Court properly rejected this argument for two reasons. First, according to an affidavit submitted by an FHA official to the District Court, no proposal for an interchange at Barron Road existed or is contemplated.[8] Thus, since no such interchange was proposed, it did not need to be included in the § 111 analysis. SPARC I, 225 F.Supp.2d at 235. Moreover, Plaintiffs have failed to demonstrate that they have standing to assert a claim pursuant to § 111. See Taubman Realty Group Ltd. P'shp v. Mineta, 320 F.3d 475, 481 (4th Cir.2003) (holding that the purpose of the Federal-Aid Highway Act is "to improve the interstate highway system in order to `meet the needs of local and interstate commerce, for the national and civil defense'") (quoting 23 U.S.C. § 101(b)). Because Plaintiffs — environmental, recreational, and sporting groups — cannot show they are within the zone of interests protected by § 111, they lack standing to make a claim under § 111.
 
 III. Costs
 
 55
 The preparation of the joint appendix is the responsibility of both parties. Fed. R.App. P. 30(b)(1). Federal Rule of Appellate Procedure 30(b)(1) provides that parties "must not engage in unnecessary designation of parts of the record." Id. Here, the parties filed a joint appendix comprising thirteen volumes and totaling approximately 7000 pages. Given the limited issues presented to us for review on appeal, we conclude that the joint appendix failed to comply with Rule 30(b)(1).
 
 
 56
 Rule 30(b) provides that "if any party causes unnecessary parts of the record to be included in the appendix, the court may impose the cost of those parts on that party." Fed. R.App. P. 30(b)(2). This is not the only remedy for violating Rule 30(b), however. Rule 30(b)(2) further provides that, "[e]ach circuit must, by local rule, provide for sanctions against attorneys who unreasonably and vexatiously increase litigation costs by including unnecessary material in the appendix." Id.[9] Moreover, Congress has provided by statute that "[a]ny attorney or other person admitted to conduct cases in any court of the United States ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927.
 
 
 57
 Because we are affirming in part and reversing in part the judgment of the District Court, we may tax the costs of this appeal as we see fit. See Fed. R.App. P. 39(a)(4). On the record before us, however, we cannot determine the extent to which either or both of the parties may have been responsible for the prolix joint appendix filed in this appeal, and thus how the costs of this appeal should be taxed and what other sanctions, if any, should be imposed. Consequently, we direct the parties to file with the Clerk of this Court proposed bills of costs within fourteen days of the date of this opinion, along with sworn affidavits discussing the roles of the parties and their respective attorneys in preparing and filing the joint appendix. Upon receipt of these materials, the panel will issue a further opinion setting forth how costs in this appeal are to be taxed and what additional sanctions, if any, will be imposed.
 
 CONCLUSION
 
 58
 For the foregoing reasons, we reverse the judgment of the District Court to the extent it declared that the Defendants were not required to perform the analysis set forth in Section 4(f) before approving construction of the interchange, and remand the case to the District Court with instructions to enter judgment for Plaintiffs with respect to this issue and to remand to the Secretary of Transportation for further proceedings consistent with this opinion for the purpose of conducting the analysis required by Section 4(f). See United States v. Kane, 602 F.2d 490, 494 (2d Cir.1979). In all other respects, we affirm the judgment of the District Court.
 
 
 
 Notes:
 
 
 [1]
 The parties consented to have the case decided by Magistrate Judge Treece pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73
 
 
 [2]
 The only way to enter or exit the airport is to travel on local streets to and from existing exits on I-84 and I-87
 
 
 [3]
 No such finding was ever made for the remainder of the Stewart Buffer Lands that will be affected by the construction of the interchange, but presumably Defendants would have reached the same conclusion if they had made a formal determination
 
 
 [4]
 As the District Court explained, the preferred design involves: "(1) a new diamond interchange at I-84 and Drury Lane at the existing Drury Lane overpass; (2) a new four-lane east-west connector roadway from Drury Lane to `C' Street; (3) reconstructing `C' Street to four lanes with a landscaped median; (4) modifications to Bruenig Road at the `Loop' in from the Stewart Airport passenger terminal; (5) widening of Drury lane to four lanes between the new I-84 interchange and the new east-west connector roadway; and (6) improvement to and/or realignment of the two-lane section of Drury Lane from I-84 to Route 17K and from the new east-west connector roadway to Route 207."SPARC I, 225 F.Supp.2d at 225-26.
 
 
 [5]
 Counts Six and Seven contained allegations that the Defendants violated NEPA and SEQRA (and their respective implementing regulations) because the EIS failed to analyze fully the cumulative environmental impacts of related development projects, including a planned 1200-acre commercial development project, the expansion of the airport, and a proposed General Electric corporate aviation facility at the airport. Plaintiffs have not appealed the District Court's granting of Defendants' motion for summary judgment on these counts
 
 
 [6]
 Defendants point to 23 C.F.R. § 771.135(h), which provides that FHA may permit a project to proceed without consideration of Section 4(f) if the properties in question were officially designated as parklands after they were acquired for transportation purposes, provided that an adequate effort was made to identify Section 4(f) properties prior to acquisition. This regulation is inapposite for two reasons. First, the Stewart Buffer Lands began being used as parklands at roughly the same time that they were acquired for the airport. Second, the purpose for which the Stewart Buffer Lands were initially acquired was not the construction of a highway interchange to and from the airport but instead as a noise buffer zone
 
 
 [7]
 The two projects were linked in the early 1990s to obtain $15.7 million in federal funding under the Intermodal Surface Transportation Efficiency Act ("ISTEA"). After initial planning, however, in 1995 NYSTA determined that the I-84/I-87 project could cost in excess of $60 million. Because that level of funding was not available, NYSTA decided to "shelve" the project. At the same time, NYSTA requested that NYSDOT request transfer of the remaining $14.4 million in ISTEA funds to the airport project. Congress agreed, and so designated those funds in the National Highway System Designation Act of 1995. Since then, the two projects have had no common funding and have proceeded down separate planning and review tracks. Significantly, the I-84/I-87 project was separately authorized by the State legislature
 
 
 [8]
 Apparently the Barron Road project was "alive" at the time of the 1992 EIS and discussed therein, but was later abandoned after the transfer of jurisdiction over the approximately 5200 acres of the Stewart Buffer Lands from NYSDOT to NYSDEC for recreational purposes
 
 
 [9]
 To date, our Court has not adopted a local rule providing for such sanctionsSee Roger J. Miner, Common Disorders of the Appendix and Their Treatment, 3 J.App. Prac. & Process 39, 46 (2001).
 
 
 
 59
 VAN GRAAFEILAND, Senior Circuit Judge, dissenting in part.
 
 
 60
 On the whole, I agree with Judge Miner's analysis of the verbose, over-8000 page, record. However, I respectfully disagree with the following determinative statement that he makes:
 
 
 61
 "Here it cannot be gainsaid that the Stewart Buffer Lands and the Crestview Lake property were established parklands. They have been used exclusively as parklands for almost thirty years since they were acquired pursuant to a series of management agreements."
 
 
 62
 When asked to pass judgment on acts that occurred decades prior to the making of the request, wisdom dictates that we give some consideration to pertinent judicial pronouncements made during the period at issue regarding the initial acquisition of the Stewart Properties. Two such pronouncements were Town of New Windsor v. Ronan, 329 F.Supp. 1286 (S.D.N.Y.1971) and County of Orange v. Metropolitan Transportation Authority, 71 Misc.2d 691, 337 N.Y.S.2d 178 (1971) aff'd mem, 39 A.D.2d 839, 332 N.Y.S.2d 420 (1972). Unlike my two colleagues, I find the following excerpts from these two opinions persuasive, if not controlling.
 
 
 Town of New Windsor
 
 
 63
 "The New York Legislature passed in April of this year, and amended in May, `An Act to authorize the establishment of an airport for the accommodation of domestic and international air travel and freight transport at Stewart airport and the making of an appropriation therefor.' Signed by the Governor in June, the Act as amended grants to MTA authority `to establish, construct, expand, rehabilitate, improve, maintain, reconstruct and operate. Stewart airport * * * * an airport for the accommodation of domestic and international air freight transport, general aviation and such other airport purposes for which there may be need from time to time.'" Id. at 1288.
 
 
 64
 ....
 
 
 65
 "Land prices are rising. The announced Stewart program seems to have enhanced this overall trend in the affected area. The land involved is sparsely occupied at present. It makes sense to take it and set it aside now for airport use rather than to wait for a time when homes and other buildings will need to be razed and other intervening interests will have to be bought. In sum, the taking of title now has obvious justification in terms of prudence and fairness. Especially when considered with the merits of the case, the opposed claims of hardship threatened hardship fall short of making a compelling case for plaintiffs. Id. At 1292.
 
 
 66
 ....
 
 
 County of Orange
 
 
 67
 "In a joint statement issued by Governor Rockefeller and members of the Legislature on May 18, 1971, it was pointed out that the acreage to be taken was `needed for runway extension, facilities and a buffer zone'; that primary emphasis would be placed on a `phased development of Stewart as an air cargo shipping center and general aviation facility'; that other development of the airport would be made in close co-operation with local officials and would be consistent with sound environmental standards and practices." Id. at 694.
 
 
 68
 ....
 
 
 69
 "It is, of course, fundamental that private lands may be taken only for a public use or purpose and only when the lands are necessary for such public use or purpose. Here, the Legislature has authorized the acquisition of lands for the purposes of `establish[ing], construct[ing and] expand[ing] an airport for the accommodation of domestic and international air travel and freight transport, general aviation and such other airport purposes for which there may be need from time to time.' Whether such purpose or use is public in character and whether the lands were in fact acquired for such use, are questions to be determined by the court (see, e.g., Fifth Ave. Coach Lines v. City of New York, 11 N.Y.2d 342, 349, 229 N.Y.S.2d 400, 183 N.E.2d 684; Denihan v. Enterprises v. O'Dwyer, 302 N.Y. 451, 99 N.E.2d 235). But at this stage in the history of aviation and public transportation, there can be no genuine doubt that the creation or expansion of an airport is a public purpose for which the power of eminent domain may be validly exercised (Hesse v. Rath 249 N.Y. 436, 164 N.E. 342; General Municipal Law, §§ 350-357; 2-A Nichols, Eminent Domain, § 7.514). Nor is there any genuine issue with respect to whether the land taken by the defendants was taken for the purposes authorized by the Legislature. The complaint, the description and map referred to in the complaint, and the public pronouncements of the defendants referred to in the verification of the complaint, all indicate that the land was acquired for the purposes set forth in the Stewart Airports Acts. There is in fact no allegation in the complaint that the land was acquired for some other purpose." Id. at 697.
 
 
 70
 The Stewart Properties are located in the towns of Hamptonburgh, Montgomery, Newburgh, and New Windsor in Orange County, New York. Generally speaking, they are bordered by Interstate Route 84 to the north, NYS Route 17K to the northeast, the New York State Thruway (Interstate Route 87) to the east, NYS Route 207, Forrester Road and NYS Route 208 to the south, and former Contrail lands to the west. The average north-south dimension of the site is approximately 2.5 miles and the average east-west dimension is approximately 6.5 miles.
 
 
 71
 Existing on-site development consists primarily of the airfield and related airport facilities, U.S. Military Academy facilities, an Air National Guard base and U.S. Department of Agriculture Animal Import and Export centers. There is also 180-acre industrial park in the northeast portion of the site, including a 70-acre U.S. Postal Service General Mail Facility and a cargo facility recently completed north of the runways.
 
 
 72
 The proposed action is to implement a plan that would allow for the development of portions of the Stewart Properties that would assist in promoting the utilization of the airport as a regional airport; to generate revenues for the State of New York and in doing so, reduce the state taxpayer's subsidy of Stewart's operation; to promote economic development in the area of the airport; accommodate projected regional commercial development demand in a sound and responsible manner; and return lost taxes and school districts costs by providing for aviation compatible development on State-owned property.
 
 
 73
 Despite the reams of factual and legal argument which have been discussed in this case, the determinative issue which I now address is relatively concise; viz. should section 4(f) have been applied? In the holding from which I now dissent, my two colleagues answer this question in the affirmative. I, however, agree with the district court which held to the contrary.
 
 
 74
 Section 4(f) provides in substance that the Secretary of Transportation may approve a transportation project requiring the use of publicly owned land of a public park or recreation area of significance "only if there is no prudent and feasible alternative to using that land; and the project includes all possible planning to minimize harm to the park or recreation area...." Plaintiffs concede that there never has been a formal designation of the land at issue as park or recreational land. SPARC I, 225 F.Supp.2d at 228. Judge Miner states, however, with little citation of supportive authority, that "for almost thirty years, state and local governments have determined that the Stewart Buffer Lands and the Crestview Lake property were to be principally used as a park," and that "[t]his uninterrupted period of use cannot be characterized as interim."
 
 
 75
 This statement, I believe, misinterprets the basic intent of the fish and wildlife management program as set forth in # 11-0501 of New York's Environmental Conservation Law, which states that its purpose is to obtain "on the privately owned or leased lands... of the state practices of... wildlife management which will preserve and develop the... wildlife resources of the state and improve access to them for recreational purposes by the people of the state." It also misapplies the provisions of # 11-0501 dealing with Cooperation Agreements, which states in paragraph c) that such an agreement "shall state the period during which it shall be in force and may provide for renewal. It may also provide for termination before the expiration of such period and for the conditions upon which and the manner in which any privilege of termination may be exercised."
 
 
 76
 The statement also misinterprets the meaning of the word "interim." This word is used in connection with airport transportation claims and generally obviates the need for section 4(f) definition. See, e.g., FAA Order 5050.4A Airport Environmental Handbook, Transportation Law.
 
 
 77
 The agreement at issue has constantly been described as "interim." (JA 1962, 1988, 2037, 2413.) Indeed, the plaintiffs have clearly recognized the terminable or interim nature of the cooperation agreements. For example, Plaintiff-Appellant, Orange County Federation of Sportsmen's Clubs, Incorporated, responding to the 1994 Solicitation of Interest, used the following illustrative statements, "ON BEHALF OF THE SPORTSMEN OF THIS COUNTY, THE FEDERATION STRONGLY RECOMMENDS THAT THE EXISTING INTERIM USES, SUCH AS, BUT NOT LIMITED TO, HUNTING, FISHING, TRAPPING, BIRDING, BIKING & HIKING ON STEWART PROPERTIES BE CONTINUED IN PERPETUITY."
 
 
 78
 ....
 
 
 79
 "THE SPORTSMEN PROPOSE PERMANENCY TO THE INTERIM RECREATIONAL USES AT STEWART, AND THE DEDICATE THE 6,500 ACES AT STEWART FOREVER WILD."
 
 
 80
 ....
 
 
 81
 This request was, of course, not honored. This fact gives added significance to FAA Order 5050.4A of the Airport Environmental Handbook, which provides that where property is owned by and designated for use by a transportation agency and a park or recreation use of the land is being made only on an interim basis, a section 4(f) ruling ordinarily is not required. We are left with the proposition that the use of the land was made only on an interim basis, and section 4(f) does not apply to temporary use. See Collin County, Tex. v. Homeowners Association, 716 F.Supp. 953, 972 (N.D.Tex.1989).
 
 
 82
 Moreover, all of this underscores the point that we are not required to determine if the decision by the Federal Highway Administration not to apply a section 4(f) analysis is correct in our eyes. We need only determine that its decision is reasonable. See SPARC I, 225 F.Supp.2d at 227. Given the fact that the land in question was acquired for transportation purposes, was always intended to be used for transportation purposes, and was only transferred on an interim basis with a termination provision to realize this intent, the decision of the Federal Highway Administration was eminently reasonable.
 
 
 83
 When the decision to create and enlarge Stewart Airport was made, hundreds of residents were evicted from the property involved. This was not intended for the benefit of hunters and other recreationists. However, conversion to airport use could not be completed overnight. Permissive interim use by recreationists did not accomplish what never was intended.
 
 
 84
 I would affirm the district court's holding in toto.